UNITED STATES of America,

v.

**Eddie JENNINGS, Defendant.**

No. 4:CR–94–0018.

United States District Court,
M.D. Pennsylvania.

June 20, 1994.

---

Frederick D. Martin, Asst. U.S. Atty., Lewisburg, PA, for U.S.

Defendant, pro se.

### MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On February 3, 1994, a grand jury sitting in the Middle District of Pennsylvania returned a three-count indictment charging defendant Eddie Jennings with two counts of assault with a dangerous weapon on a correctional officer engaged in the performance of his official duties, in violation of 18 U.S.C. § 111(a)(b) (Counts One and Two), and with

possession of a prohibited object, the weapon, while in a federal correctional institution, in violation of 18 U.S.C. § 1791(a)(2), (d)(1)(B) (Count Three). Jennings entered a plea of not guilty at arraignment on March 24, 1994.

On June 7, 1994, a jury returned verdicts of guilty on all three counts of the indictment. Jennings was sentenced to a total of 210 months incarceration for the three counts, to be served consecutively to sentences previously imposed in this court and the United States District Court for the Central District of California. A breakdown of this sentence is provided later in this memorandum.

The course of the prosecution of this case involved several unusual issues and incidents, requiring the court to make unusual rulings. This memorandum is intended to memorialize and explain further the rationale underlying those rulings.

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A. Prior Case

Jennings first came before this court in a case docketed to No. 4:CR–92–204–01. In that case, Jennings, then an inmate at the United States Penitentiary at Lewisburg, Pennsylvania, was indicted for assault on a federal officer, assault with a dangerous weapon on a federal officer, and destruction of government property. The charges grew out of a melee incited at USP–Lewisburg when Jennings punched Lieutenant Duane Heverly of the Federal Bureau of Prisons. In the ensuing confusion, Corrections Officer Darryl Bird of the BOP was struck with a folding chair. It was the chair which was alleged in the indictment to have been the dangerous weapon.

At trial, witnesses for the government were unable to identify with precision the person who struck CO Bird with the chair, and Jennings was acquitted of that charge. However, he was found guilty by the jury of the remaining charges. Those included the assault on Lieutenant Heverly in violation of 18 U.S.C. § 111, and the destruction of government property in violation of 18 U.S.C. § 1361. The latter charge arose from Jennings' use of a folding chair to shatter a glass restraining grill within the penitentiary. The court scheduled sentencing for Thursday, February 18, 1993, at 9:00 a.m. in the Federal Building, Williamsport, Pennsylvania.

### B. Sentencing in No. 4:CR–92–204–01

At the designated time and place, the court, counsel for the government, and counsel for Jennings assembled in Williamsport. However, the court was notified that officers at USP–Lewisburg were having difficulty transferring Jennings into the custody of the United States Marshals Service,[1] which is responsible for the transport of prisoners to the courthouse. Unable to determine whether the difficulty constituted a valid waiver of the right to be present at sentencing, the court directed that Jennings was to be produced.

At 11:22 a.m., the court convened for sentencing, with Jennings present in full body restraints. According to representations made to the court, he had been physically removed from his cell by the BOP and transferred to the custody of the marshals. Jennings was sentenced to concurrent terms of thirty-six months for the two counts for which he was found guilty, with those terms to run consecutive to the term of imprisonment imposed by the court in the Central District of California.

Prior to sentencing, the court was unaware of the exact circumstances underlying the delay in Jennings' appearance before the court. The court was aware only that Jennings would not leave his cell and did not wish to come to Williamsport, and the court responded that Jennings had to come to Williamsport. At trial of the instant case, the reasons for the delay became clear.

### C. Events at USP–Lewisburg on February 18, 1993

On the date set for sentencing, Jennings was housed in solitary confinement in the

1. Although they may have different designations such as "Deputy United States Marshal," for the sake of simplicity, employees of the United States Marshals Service will be referred to herein as "marshals."

Special Housing Unit ("SHU," also known in prisons as "the hole"). SHU is in a 24–hour lock-down, and is used for disciplinary, protective, and similar purposes. Early that morning, Jennings was permitted to shower for his court appearance. The lieutenant then in charge of SHU, Lieutenant James Jarrett, approached Jennings' cell to inform him that the marshals had arrived and were waiting at Receiving & Discharge ("R & D") to transport Jennings to Williamsport. Jennings told Lieutenant Jarrett that he wanted to take a "Walkman" radio with him to the courthouse. Permission to take the radio was denied by the marshals, pursuant to the policy of the Marshals Service.

Upon the refusal to allow Jennings to take his radio, the atmosphere in Jennings' cell became dark, both literally and figuratively. Jennings used blankets and towels to cover the outside window to his cell, the small window in the door to the cell, and a small slot in the door to the cell known as a "wicket." The latter opening, similar to a mail slot, is used to pass items into the cell and receive items from the cell, and for the purpose of placing handcuffs on an inmate ("cuffing up") without the need to open the cell door. The wicket is covered by a flat plate with hinges and a key-lock.

Corrections officers approached Jennings' cell for the purpose of cuffing up and exit to R & D, where the marshals were waiting. Jennings refused to cuff up and claimed, for the first time, that his life was in danger if he exited his cell. He demanded to see higher authorities, including the undersigned judge. The corrections staff assembled two teams of officers for the purpose of removing Jennings from the cell. The first is known as a confrontation avoidance team and is designed to avoid a physical altercation. The team consists of staff who appear to have some rapport with the inmate, and their task is to convince the inmate to follow directions without the need for force. The second type of team is known as a forced cell movement team, the purpose of which is to physically restrain and remove a troublesome inmate.

In Jennings' case, the confrontation avoidance team consisted of Lieutenant Jarrett and Jennings' case manager. They were unsuccessful in convincing Jennings to cuff up and leave his cell peaceably. Final directions to cuff up were given to Jennings, and he continued to refuse. The forced cell movement team then was called upon to remove Jennings from his cell. Cell doors in the SHU are operated electronically at a separate station. Jennings' door was opened with the forced cell movement team ready outside.

In order to understand the ensuing events, it is important to understand what "ready" means for a forced cell movement team. These teams consist of six to eight corrections officers wearing protective clothing and gear. This consists of a jump suit, protective gloves, a flak jacket-type vest, and a helmet. The helmet resembles a football helmet, but with a screen covering the entire area over the face; the protective mask more closely resembles a lacrosse face mask. Each member of the team has a specific assignment, either control of a particular limb or placement of restraints on the inmate. Two other members of the team are "in reserve" outside of the cell in case the inmate breaks loose. No member of the forced cell movement team carries a weapon. Entry into the cell is videotaped, and a videotape camera is kept outside of the cell to record any action which may occur in the hallway.

During the trial of the instant matter, the government introduced into evidence and played for the jury the videotape of the entry into Jennings' cell on February 18, 1993. The tape first shows the final efforts to talk Jennings into leaving his cell,[2] Jennings' tirade about the alleged threat to his personal safety, and the final direction of the corrections staff to cuff up. Jennings again refused.

The cell door was opened with the forced cell movement team immediately outside. Jennings partially emerged from the cell, and thrust upward with an improvised weapon, known in prison vernacular as a "shank," at the first officer of the team, Corrections Offi-

---

**2.** A viewer of the tape also hears, prior to the camera's arrival at the cell, another inmate (not Jennings) declarations, interlaced with profanity, to the officers to "bring it on."

cer Robert Wolever. The weapon resembled an ice pick and was made of metal attached to a wooden handle, both of which apparently came from a mop. Attached to the handle was a loop of light blue cloth torn from a bedsheet. Also around Jennings' hand and wrist was a white sock. The sock and loop served to prevent the knife from being removed from Jennings' possession. The forced cell team was unaware of the presence of the shank prior to the opening of Jennings' cell door.

Fortunately, the initial thrust missed CO Wolever, sweeping within inches of the protective mask. The point of the shank, however, might well have avoided the mask because the angle at which the thrust was made would have brought the point up under the bottom of the mask. The approach of the officers forced Jennings back inside the door and the struggle continued inside.

Jennings was knocked onto his back and CO Wolever, whose assignment was the left arm, sought to control the arm and neutralize the weapon held in the left hand. Before he was able to do so, both CO Holdren and the second team member into the cell, Corrections Officer Thomas Holdren, were struck by the shank. CO Wolever had difficulty removing the shank from Jennings' hand because of the loop and sock. CO Holdren then gained control of Jennings' left hand and was punched in the helmet several times by Jennings (using his right hand) before CO Wolever was able to gain possession of the shank. Finally, CO Holdren and CO Wolever were able to control Jennings' arms while other officers controlled Jennings' legs and restraints were placed on Jennings.

Jennings then was carried by the forced cell team to R & D, where marshals were to take custody of Jennings. A physician's assistant employed by the BOP checked the restraints and minor adjustments for circulation were made. Jennings then was transported by the marshals to the courthouse for sentencing. Jennings was sentenced and returned later to USP–Lewisburg while still in the restraints. He suffered no serious injury.

After Jennings was brought to R & D, two members of the team were found to have been injured. CO Wolever suffered puncture wounds of the left wrist and forearm, right elbow, and right thigh. *See* Government's Exhibit 8. CO Holdren suffered puncture wounds to his upper right arm and the left side of his shoulder/neck area. *See* Government's Exhibit 9. The wounds were not life-threatening but did require medical attention.

### D. Indictment and Later Events

On February 3, 1994, an indictment returned by a grand jury sitting in the Middle District of Pennsylvania charged Jennings with the offenses set forth in the "Background" section of this memorandum. In short, Jennings was charged with two counts of assault on a federal officer with a dangerous weapon and one count of possessing a prohibited object.

Counsel was appointed for Jennings, and a number of pretrial motions were filed on Jennings' behalf. Included was a petition for writs of habeas corpus ad testificandum which sought to have six inmates brought to court to testify on Jennings' behalf. The proffered testimony indicated that Jennings would argue that his actions in SHU on the morning of February 18, 1993, constituted self-defense. The petition for writs of habeas corpus ad testificandum was denied on the basis that the proffer did not contain facts sufficient to support a claim of self-defense. A motion for reconsideration of that ruling also was denied.

Defendant then filed a second petition for a writ of habeas corpus ad testificandum, seeking to introduce evidence of voluntary intoxication. That petition was denied because, as we ruled in No. 4:CR–92–204–01, § 111 sets forth a general intent crime to which voluntary intoxication is not a defense.

Prior to jury selection on May 31, 1994, the court entertained a motion by Jennings to substitute counsel. Jennings proffered no valid reason for the substitution, and the motion was denied. Whereupon, in open court, Jennings hit his counsel in the side of the head with his closed fist, causing counsel to reel to the courtroom floor. The blow caused swelling and redness on the cheek

and just below the left ear of counsel. Six marshals were required to restrain defendant, and he was taken from the courtroom. The court then allowed counsel to withdraw, and held that defendant had waived his right to the appointment of counsel.

Immediately prior to jury selection, which had been continued to June 1, 1994, Jennings made threatening remarks, particularly against the Assistant United States Attorney, corrections officers, and his former counsel. These remarks, interspersed with foul language, included threats to cut the throat of former counsel and "drink his blood," to "slaughter" corrections officers, and to murder the Assistant United States Attorney.[3] Since Jennings possesses enormous physical strength, such threats were and are taken seriously by the court.

On June 7, 1994, Jennings was transported without incident to the courthouse from USP–Lewisburg for trial and acted as his own attorney at trial. Prior to commencement of trial, Jennings provided to the court a document asserting that he objected to all pretrial proceedings and to the conduct of the trial. No questions were asked of any government witness on cross-examination. Jennings' defense consisted of his own testimony that he did not contest the government's case, that what he did was wrong, but that he had done things much worse and that he would do things much worse in the future (Jennings also said much the same in his opening statement). Jennings' only point of contention with the government's case was that he did not think a conviction in the instant case would solve the problem of his violent behavior.

Following closing argument by the government (Jennings waived his closing argument) and the court's charge, the jury returned verdicts of guilty on all three counts of the indictment. An error in the manner in which the verdict slip was completed was corrected by sending the jury back to deliberation to complete a new form.

After the verdict was returned, the court imposed sentence. We found that "there is in the record information sufficient to enable the meaningful exercise of sentencing authority pursuant to 18 U.S.C. [§ ] 3553 ..." Fed.R.Crim.P. 32(c)(1). The presentence investigation report conducted relative to No. 4:CR–92–204–01 was entered upon the record and that report contained sufficient information for imposition of sentence in the instant case, because Jennings' intervening incarceration had precluded any material change in circumstances since preparation of the report. Neither the government nor Jennings objected to the timing of sentencing or the use of the previous presentence investigation report.

Based upon the information contained in the earlier presentence investigation report and the circumstances surrounding the charges in the instant case, the court imposed a sentence of 210 months. Jennings was sentenced to 120 months' incarceration for Count One, to be served consecutively to the sentence imposed in the Central District of California and the sentence imposed by this court in No. 4:CR–92–204–01. A sentence of 90 months' incarceration was imposed for Count Two in order to reach the aggregate sentence required under the United States Sentencing Guidelines. The latter term is to be served consecutively to the sentence imposed for Count One. Finally, the court imposed a sentence of 60 months' incarceration for Count Three, to be served concurrently with the terms of incarceration imposed for Counts One and Two. The period of incarceration is to be followed by a period of supervised release of three years. Fines were not imposed based upon Jennings' inability to pay.

## II. ISSUES TO BE ADDRESSED

As noted above, this case involved several extraordinary events and circumstances, leading to unusual rulings by the court, including determinations (1) that Jennings' proffer did not provide a factual basis for a claim of self-defense; (2) that voluntary intoxication is not a valid defense to a charge of violating § 111; (3) that defendant's conduct effected a waiver of his right to appointed counsel; (4) to proceed with jury selection with defendant absent from the courtroom;

---

**3.** Jennings told the prosecutor that he was "the    one I wanted anyway."

and (5) to impose sentence immediately following the return of a verdict, without the preparation of a presentence investigation report. These rulings will be addressed *seriatim*.

### III. SELF–DEFENSE

As part of his pretrial motions, Jennings filed an under seal, *ex parte* petition for writs of habeas corpus ad testificandum of other inmates. We issued a memorandum and order denying that petition and a memorandum and order denying a motion for reconsideration, from both of which most of the language of this section is taken.

#### A. Writ of Habeas Corpus Ad Testificandum

■ A federal district court has the authority to issue a writ of habeas corpus ad testificandum, which secures the appearance of an inmate, either state or federal, as a witness before the court. 28 U.S.C. §§ 2241(c)(5), 1651(a). A criminal defendant seeking such a writ must also satisfy the procedural requirements of Fed.R.Crim.P. 17(b). *United States v. Cruz–Jiminez,* 977 F.2d 95, 99 (3d Cir.1992). The Compulsory Process Clause of the Sixth Amendment to the United States Constitution guarantees the right of a criminal defendant to offer testimony of witnesses favorable to the defense and to have compulsory process for the appearance of favorable witnesses. *Cruz–Jiminez,* 977 F.2d at 100 (citations omitted). Moreover, a court may not arbitrarily impede the ability of the defendant to present a defense. *Id.*

■ "[H]owever, this right to present evidence is not absolute. A mere showing by the accused that some relevant evidence was excluded is insufficient; the accused must demonstrate that 'the testimony would have been both material and favorable to his defense.'" *Id.* A defendant's right to compul-

sory process is violated when: (1) he is deprived of the opportunity to present evidence in his favor; (2) the excluded testimony would have been material and favorable to his defense; and (3) the deprivation is arbitrary or disproportionate to any legitimate evidentiary or procedural purposes. *Id.*

#### B. Jennings' Proffer

In his petition, Jennings sought writs for each of the following, all inmates in federal correctional facilities (the facility to which each is designated follows the name of the inmate):

| | |
|---|---|
| Kent Clark | USP–Marion, Ill. |
| Corey Fowler | USP–Marion, Ill. |
| Ron Moore | USP–Marion, Ill. |
| Carlos Johnson | USP–Marion, Ill. |
| Gene DiUlio | USP–Marion, Ill. |
| Leroy Thompson | USP–Florence, Colo. |

Jennings offered the testimony of each of these individuals for the purpose of showing that each was aware of harassment of and threats toward defendant by staff at the USP–Lewisburg. Carlos Johnson also would have testified that he continually told Jennings on the night before the incident that Jennings would be beaten if he left his cell, and that he provided a weapon to Jennings.[4] Specifically, Jennings' proffer was as follows:

As part of his defense, Defendant wishes to produce evidence that, as a result of his acquittal on Count I in 4:CR–92–0204–01, correctional officers at USP Lewisburg harassed and threatened physical retaliation against Defendant because of the acquittal including threats that Defendant would be severely beaten before he could be transferred from USP Lewisburg; that the harassment and threats of serious bodily injury escalated up to and including the morning of February 18, 1993; that as of the morning of February 18, 1993, Defendant was in great fear for his physical safety that he believed the correctional

4. This particular testimony defies credibility. Once the petition for writs of habeas corpus was denied, the second petition was filed, proffering the testimony of inmate Johnson to the effect that Jennings was drunk on the morning of February 18, 1993, and that Johnson provided the alcoholic beverage. Apparently, in the time period between the motions, Johnson must have realized that he had mistaken several gallons of alcohol for a shank shaped like an ice pick. Johnson currently is serving life sentences for two murders committed with shanks within United States penitentiaries. Johnson's unquestionable expertise in this dubious skill hardly supports the likelihood of such a mistake.

officers and staff of USP Lewisburg intended upon beating him and inflicting serious bodily injury; and that Defendant's refusal to leave his cell on the morning of February 18, 1993, and resulting conduct was justified as a result of his reasonable fear that he may be caused serious bodily injury at the hands of correctional officers and staff at USP Lewisburg.

Petition for Writs of Habeas Corpus Testificandum at 2–3, ¶ 7. This proffer indicates a theory of self-defense. In order to justify a writ of habeas corpus ad testificandum, then, Jennings had to demonstrate that the testimony of the witness would be favorable to the defense and material to a defense of self-defense.

### C. Law of Self–Defense

■■■ To raise a valid claim of self-defense to a charge of assault under § 111, the defendant must show: (1) that he did not know the official status of the person assaulted; (2) that he reasonably believed that he was being attacked; and (3) that he used reasonable force to defend himself. E. Devitt, C. Blackmar, and K. O'Malley, 2 *Federal Jury Practice and Instructions* § 23.12. *See also United States v. Gometz,* 879 F.2d 256, 259 (7th Cir.1989) (danger must occur at or near the point in time defendant committed the alleged acts), *cert. denied,* 493 U.S. 1033, 110 S.Ct. 752, 107 L.Ed.2d 768 (1990).[5] Once the defendant produces evidence of the foregoing, the burden of proof is on the government to show that (1) the defendant knew that the person assaulted was a federal officer at the time of the assault, *or* (2) the force used by the defendant was excessive and would not have been justified even if the person assaulted was a private citizen and not a federal officer. *Id. See also United States v. Alvarez,* 755 F.2d 830, 842–843 (11th Cir.), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985) (knowledge of official status of victim relevant to claim of self-defense, and government may prove either of above alternatives to establish case).

### D. Application of Law to Facts

■■■ Jennings' proffer in the instant case simply failed to meet the standards necessary to establish self-defense, even accepting as true all of his allegations. Basically, Jennings contended that he had a reasonable basis for believing that officers at USP–Lewisburg intended to seek revenge for his acquittal on an earlier assault charge. This basis was threats by the officers and warnings from fellow inmates.

However, Jennings had no reasonable basis for believing that an attack was imminent. The officers who came to his cell directed him to exit the cell for the purpose of leaving the prison for sentencing on the earlier assault charge. Jennings, an inmate, certainly knew that the corrections officers and marshals were federal officers, and they clearly were acting within the scope of their authority in transporting him to the courthouse. No aggressive action was taken relative to Jennings until well after his initial refusal to exit the cell, and there is no indication that excessive force was used in subduing and transporting Jennings to the courthouse. A preemptive strike does not constitute valid self-defense.

It also is appropriate to note that self-defense is a fact-specific defense, i.e. the standard is that a person *in the same situation as the defendant* would reasonably be-

---

**5.** Gometz also presented a self-defense argument for a charge of violating § 111, and the court allowed testimony of alleged abuse by prison officials. However, it then restricted the use of this evidence by refusing to instruct the jury that it had to consider the defendant's incarceration in evaluating the self-defense claim, and by instructing on the requirement of proximity in time. This opinion, then, is consistent with our conclusion that a self-defense claim will not lie without evidence of imminent bodily harm. The absence of a temporal connection would make Gometz' claim of abuse immaterial to a self-defense claim. The trial court in *Gometz* made this ruling in the form of its instructions after presentation of evidence; we make this ruling based on the proffer by Jennings of the evidence to be presented. As the Seventh Circuit concluded that Gometz' proposed instruction would lead to illogical consequences, i.e. permitting the possession of contraband simply because prisons are inherently dangerous places, 879 F.2d at 259–260, we conclude that holding that a self-defense claim is valid leads to illogical consequences, i.e. that it is lawful for an inmate to attack a corrections officer because he thinks the officer some day may try to harm the inmate.

lieve that force is necessary to prevent an imminent attack, and the force used in response must be reasonably proportional to the perceived threat. E. Devitt, *et al., supra*, § 23.12; *United States v. Oakie*, 12 F.3d 1436, 1443 (8th Cir.1993). *Cf.* 18 Pa.Cons. Stat.Ann. §§ 505, 509(5). Jennings' situation on February 18, 1993, was that of an inmate in a federal penitentiary. As such, he was required to obey the lawful directions of the corrections officers, including the order to cuff up and leave his cell. Submission by inmates to the lawful commands of corrections officers is fundamental and absolutely necessary to the maintenance of proper order in a correctional facility. A prisoner is not justified in refusing to obey these commands simply because he has a subjective belief that a beating *may* occur. Until there is tangible evidence that the use of unreasonable force is imminent, an inmate is not justified in using physical force, particularly deadly force as in the instant case, to resist corrections officers. *Cf. Oakie, supra,* 12 F.3d at 1443 (self-defense not a valid defense when evidence showed that no aggressive action taken by police officer other than giving chase in a well-marked police car); *United States v. Streit*, 962 F.2d 894, 898 (9th Cir.1992) (defendant not entitled to a self-defense instruction when he resisted use of reasonable force by FBI agents who had identified themselves).

In short, while the court must permit a defendant to present evidence favorable to the defense and material to a meritorious defense, the defense proffered by Jennings was lacking in merit under the circumstances. The persons allegedly assaulted by Jennings clearly were federal officials. As an inmate, Jennings was required to submit to the lawful commands of corrections officers, and the use of physical force to resist such commands is not justified. Jennings knew that he was scheduled to be sentenced in Williamsport, so that he knew the reason he was ordered out of his cell. There was no tangible evidence that use of unreasonable force was imminent, such as threatening gestures or raised weapons.

In support of this defense, Jennings would have had the government transport to Williamsport inmates currently housed in other parts of the country. The inmates whose presence defendant sought are high security risks. Inmates Moore and Johnson, for example, were convicted of first-degree murder in 1993 in this court as the result of the violent killing of a third inmate. *United States v. Ron Moore and Carlos Johnson*, No. 4:CR–92–0322. Prior to trial, Moore and Johnson tried to attack Moore's court-appointed counsel in a holding cell. At sentencing, Johnson threatened the court, government counsel, and other court and law enforcement personnel.[6]

The government therefore would be burdened with transporting a number of dangerous inmates large distances, to be brought together at the time of trial, compounding the risks and difficulties. This burden is balanced against a defense which cannot be sustained based upon the proffer of the party bearing the burden of demonstrating the need for the testimony of these witnesses. Clearly, this balance weighed against the granting of writs of habeas corpus ad testificandum for these inmates.

For these reasons, the under seal, *ex parte* petition for writs of habeas corpus ad testificandum was denied. Jennings thereafter filed a motion for reconsideration in which he contended that (1) he had a reasonable belief that he was about to suffer death or serious bodily injury and (2) that such a belief, even if a mistake, negates the *mens rea* requirement of § 111.

In his brief in support of the motion for reconsideration, Jennings pointed to the circumstances of the entry of the forced cell movement team into his cell: a number of men in visored helmets, flak jackets, etc., charging into his cell and subduing him. As we noted in our earlier memorandum, however, a defendant's fear of imminent bodily harm must be reasonable. In the conditions described, such a claim is *not* reasonable.

Jennings refused, unlawfully, to come out of his cell. The order to leave his cell came from corrections officers. Jennings knew

6. Unlike Jennings' counsel, however, Johnson    gave his counsel a "free pass."

that he was required to obey the orders of corrections officers. Having refused, Jennings knew that force could be used to compel obedience to the lawful commands; in other words, the entry of a forced cell movement team is the normal result of the conduct such as Jennings on February 18, 1993. Corrections officers therefore were entitled to act as they did, and any belief on the part of Jennings that unnecessary force was imminent was unreasonable.

We emphasize that we made this finding as a matter of law. No reasonable jury could find, based upon the facts proffered by Jennings, that he was justified in his using deadly force to resist the actions of the corrections officers.

Jennings' claim that he was "manipulated" into acting as he did also is unavailing. Prior threats and harassment, even assuming that they occurred, do not make physical harm "imminent." In order for a belief that physical harm is imminent to be reasonable, there must be some objective manifestation of an intent to inflict harm, not just threats indicating that physical harm *may* occur or circumstances under which physical harm *might* occur or is possible. We reiterate and reemphasize: a preemptive strike does not constitute valid self defense.

The latter also applies to Jennings' contention that he believed that the corrections officers were about to act outside the scope of their official status and inflict harm upon him. Jennings claimed that this was a mistake of fact, and equated it to a situation in which an actor is not aware of the official status of the person assaulted and resists an arrest. Actually, Jennings' mistake was not one of fact.

Corrections officials have the authority to use force in particular situations; the events of February 18, 1993, constituted such a situation. There was no mistake as to the facts as they then existed. Jennings' mistake, accepting his proffer, was to events that might occur in the future: *if* the corrections officers were to use unreasonable force, they would be outside of the scope of their official status. The corrections officers would not be acting outside of their official status *until* they used unreasonable force. Jennings knew that this situation did not then exist, since the officers were entitled to employ force. Jennings therefore was not justified in using force.

All of the above conclusions were reached based solely upon Jennings' proffer in the petition for writs of habeas corpus ad testificandum and the motion for reconsideration. The court since has viewed the evidence produced at trial by the government, and is convinced more firmly that self-defense did not apply to the facts of the instant case.

First, the evidence showed that Jennings' initial refusal to cuff up was not the result of some supposed fear of imminent danger; it was due to Jennings' insistence on bringing a radio to the courthouse. Somehow, it was safe for Jennings to leave his cell as long as he had a radio; without his Walkman, Jennings' life was in danger.

More importantly, the videotape of the incident made clear that Jennings was not preparing to defend himself because an attack was imminent. Rather, to paraphrase a portion of the prosecuting attorney's closing argument, Jennings was preparing to go to war. The light in the cell had been extinguished; the window was covered, as was the door opening; the wicket also was blocked. All of this meant that no light could enter Jennings' cell, and he was free to act unobserved. Jennings already had possession of a carefully crafted, dangerous implement. He placed the weapon in his hand in such a manner as to resist its removal. Jennings then refused to obey a direction from corrections staff, knowing that such a refusal is unacceptable. He resisted the efforts of the confrontation avoidance team and continued to disobey directions. When the forced cell movement team assembled in front of his cell and the cell door opened, it was *Jennings* who attacked the officers, not vice versa.

One final, important point should be considered. Jennings argued that he felt duress because of the number and appearance of the members of the forced cell movement team. However, the team wore protective gear only, and their numbers are necessary for the protection of the officers, which need was amply demonstrated by Jennings himself. This fact must be emphasized: *No member*

*of the forced cell team which entered Jennings' cell on February 18, 1993, carried a weapon; all equipment and outfitting was designed for defensive purposes only.*

In short, none of the circumstances existing on the morning of February 18, 1993, would lead a reasonable person to believe that an unlawful use of force was imminent. Jennings himself created a situation in which it was necessary for corrections staff to physically remove him from his cell. Simply stated, it is not valid self-defense when an actor creates a situation requiring the use of force by law enforcement or corrections officials, then resists the use of such force.

For these reasons, the petition for writs of habeas corpus ad testificandum were denied, as was the motion for reconsideration of thereof.

## IV. VOLUNTARY INTOXICATION

After denial of his petition for writs of habeas corpus ad testificandum related to the claim of self-defense, Jennings filed, *nunc pro tunc*, a second petition for a writ of habeas corpus ad testificandum. The second petition set forth a proffer of facts related to a defense of self-intoxication.

### A. Jennings' Proffer

Jennings' proffer in the second petition was that he was voluntarily intoxicated on the morning of February 18, 1993. The petition stated that Carlos Johnson would testify that, on the evening of February 17, 1993, he provided to Jennings two to three gallons of a home-made alcoholic beverage brewed from oranges, raisins, sugar and water. Johnson also would have testified that Jennings manifested signs of being intoxicated on the morning of February 18, 1993. Defendant argued that his voluntary intoxication is a defense because it prevented him from forming the specific intent to commit a violation of § 111.

### B. Intent Requirement under § 111

■ In support of this contention, Jennings cited cases from the Courts of Appeals for the First, Fifth, Seventh, Eighth, and Tenth Circuits which have held or arguably implied that assault upon a federal official is a specific intent crime. *See United States v. Caruana,* 652 F.2d 220 (1st Cir.1981); *United States v. Taylor,* 680 F.2d 378 (5th Cir. 1982); *United States v. Green,* 927 F.2d 1005 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 147, 116 L.Ed.2d 112 (1991); *United States v. Staggs,* 553 F.2d 1073 (7th Cir. 1977); *United States v. Manelli,* 667 F.2d 695 (8th Cir.1981); *United States v. Simmonds,* 931 F.2d 685 (10th Cir.), *cert denied,* —— U.S. ——, 112 S.Ct. 129, 116 L.Ed.2d 97 (1991). Also, another judge of the Middle District of Pennsylvania instructed a jury that assault in violation of § 111 is a specific intent crime. *United States v. Milton,* No. 4:CR–02–0016 (M.D.Pa.N.T. June 16, 1992) (Muir, J.). Other courts have ruled that assault in violation of § 111 is a general intent crime. *See United States v. Jim,* 865 F.2d 211 (9th Cir.), *cert. denied,* 493 U.S. 827, 110 S.Ct. 93, 107 L.Ed.2d 58 (1989); *United States v. Hill,* 526 F.2d 1019 (10th Cir.1975), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976).

This court previously has ruled that assault upon a federal official is a general, and not a specific, intent crime; that ruling was made in the very case for which defendant was to be sentenced on February 18, 1993, No. 4:CR–92–204–01. We adhere to our prior ruling, and find that assault upon a federal official in the performance of his official duties is a general intent crime to which voluntary intoxication is not a valid defense.

Another case cited by defendant in support of the proposition that assault under § 111 is a specific intent crime is *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). Defendant quotes all but the highlighted portion of the following:

We are not to be understood as implying that the defendant's state of knowledge is never a relevant consideration under § 111. The statute does require a criminal intent, and there may well be circumstances in which ignorance of the official status of the person assaulted or resisted negates the very existence of mens rea. *For example, where an officer fails to identify himself or his purpose, his conduct in certain circumstances might rea-*

*sonably be interpreted as the unlawful use of force directed either at the defendant or his property. In a situation of that kind, one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent.*

We hold, therefore, that in order to incur criminal liability under § 111 an actor must entertain merely the criminal intent to do the acts therein specified....

*Feola,* 420 U.S. at 686, 95 S.Ct. at 1264–65 (footnote omitted).

Nothing in this portion of the *Feola* opinion indicates that assault under § 111 is a specific intent crime. The Supreme Court had ruled that the actor need not know of the official status of the person assaulted or impeded in order for there to be a violation of § 111. The court in the foregoing provision then distinguishes the situation in which the actor knows of the official status of the victim from the situation in which the actor is ignorant of the official status of the victim.

■ In the latter situation, the language of *Feola* quoted above is consistent with our prior ruling in this case concerning self-defense. When a person, not identified as a law enforcement officer, uses force against the accused which is not lawful for persons other than law enforcement personnel, and the accused uses force to resist, the resistance may be justifiable self-defense. Our prior ruling is the obverse: when a person is identified as a law enforcement officer, and uses reasonable force in the performance of law enforcement duties, the use of force to resist the officer is not justified, and self-defense does not apply. When the officer uses unreasonable force, self-defense or justification applies because the officer is no longer engaged in the performance of official duties, another element of a § 111 violation; in such an instance, the officer would be acting outside of his official capacity, because the use of unreasonable force is inconsistent with "the performance of official duties" under the statute.

Another portion of *Feola,* to which defendant does not refer, supports this conclusion.

In the present case, we see again the possible consequences of an interpretation of § 111 that focuses on only one of the statute's apparent aims. If the primary purpose is to protect federal law enforcement personnel, that purpose could well be frustrated by the imposition of a strict scienter requirement. On the other hand, if § 111 is seen primarily as an anti-obstruction statute, it is likely that Congress intended criminal liability to be imposed only when a person acted with the specific intent to impede enforcement activities. Otherwise, it has been said: "Were knowledge not required in obstruction of justice offenses described by these terms, wholly innocent (or even socially desirable) behavior could be transformed into a felony by the wholly fortuitous circumstance of the concealed identity of the person resisted." Although we adhere to the conclusion in *Ladner* [*v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958),] that either view of legislative intent is "plausible," we think it plain that Congress intended to protect *both* federal officers and federal functions, and that, indeed, furtherance of the one policy advances the other. The rejection of a strict scienter requirement is consistent with both purposes.

*Feola,* 420 U.S. at 678–679, 95 S.Ct. at 1261 (footnote omitted; emphasis in original). The same is true of the rejection of a specific intent requirement.

■ A clearer understanding of the foregoing requires closer examination of the terms being expressed. "General intent" is defined as "[i]n criminal law, the intent to do that which the law prohibits. It is not necessary for the prosecution to prove that the defendant intended the precise harm or the precise result which eventuated." Black's Law Dictionary 810 (6th ed. 1990). "Specific intent" is defined as "[i]n criminal law, the intent to accomplish the precise act which the law prohibits; *e.g.* assault with intent to rape." *Id.*[7] Applying these definitions to

7. In this context, it might also be useful to add that "criminal intent" is simply a general term for the level of intent necessary to commit what-

ever crime is under consideration. The term applies to both specific intent and general intent. Black's Law Dictionary 373 (6th ed. 1990).

the statute and crime in question, and considering the purposes of the statute as discussed in *Feola*, the application of the specific intent requirement would defeat the dual purpose of the statute. If a person acts in a manner which is assaultive toward a federal official, without specifically intending harm or the apprehension of imminent harm, the official still would be impeded in the performance of his official duties; rejection of criminal culpability in this instance due to the heightened intent element defeats the other purpose underpinning the statute.

More importantly, a holding that assault under § 111 is a specific intent crime is inconsistent with the Supreme Court's holding in *Feola*. Specific intent to violate § 111 would mean the intent to prevent the harms prohibited: (1) impeding performance of official duties or (2) harm, attempted harm, or apprehension of imminent harm in the performance of official duties. The Supreme Court held in *Feola* that knowledge of official status is not required under § 111. If a person does not know of a victim's official status, the person cannot be attempting to bring about the result (harm in the performance of official duties) which is proscribed. Yet they are still criminally culpable, meaning that it *must* be the intent to commit the proscribed *act* which forms the criminal intent.

Finally, and perhaps most importantly of all, a complete absurdity would result from defendant's interpretation of the statute. The defense of voluntary intoxication applies to specific intent crimes because the intoxication negates the mens rea. If the level of intent for a § 111 violation is specific intent, then the defense would apply to assaults by prisoners on corrections officers. It is incomprehensible that inmates could attack guards and be within the bounds of the law so long as they (the inmates) are drunk at the time of the attack. Yet defendant's interpretation would countenance such an absurd result.

In short, we hold that assault on a federal official in violation of 18 U.S.C. § 111 is a general intent crime to which the defense of voluntary intoxication is inapplicable. Defendant's proffered evidence was neither material nor favorable to a valid defense, and the petition for a writ of habeas corpus ad testificandum was denied.

## V. WAIVER OF THE RIGHT TO THE APPOINTMENT OF COUNSEL

As discussed above, jury selection was scheduled originally for May 31, 1994. The court scheduled a hearing on Jennings' motion for the appointment of new counsel, a motion made on the eve of jury selection. After the court ruled that Jennings had failed to state a valid reason for the substitution of counsel, but before the court could begin a colloquy on Jennings' desire to proceed *pro se*,[8] Jennings turned on his court-appointed counsel. The punch delivered to counsel sent him to the floor and caused minor physical injury.[9] Jennings then was removed from the courtroom.

While counsel offered to wait upon the court's ruling on his motion to withdraw, the court deferred ruling on the motion while counsel sought a medical examination and treatment. Counsel later was informed that the motion would be granted, and counsel was not required to appear further. On June 1, 1994, the court put on the record our ruling that counsel's motion to withdraw was granted, and that Jennings had waived the right to the appointment of new counsel by his conduct. It was then that Jennings began his threatening conduct and was removed from the courtroom for selection of the jury.

Jennings also told the marshals that his original intention with regard to counsel was to lean close for a whispered consultation, then to bite counsel's ear off. He rejected this course of action only because of the mayhem he presumed would follow, not due to any concern for counsel's welfare.

8. Jennings indicated that he preferred to represent himself than proceed with his then-current counsel.

9. Jennings, in a statement that can only be described as the epitome of cynicism, told the marshals, "OK, don't rough me, now."

## A. The Right to Appointed Counsel

It is axiomatic that an indigent defendant has the right to appointed counsel and to be informed of that right. *See Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The right of an accused to effective assistance of counsel, however, does not extend to the appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel. *Morris v. Slappy*, 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617–1618, 75 L.Ed.2d 610 (1983); *Siers v. Ryan*, 773 F.2d 37, 44 (3d Cir.1985) (citing *Davis v. Stamler*, 650 F.2d 477, 479–480 (3d Cir.1981)), *cert. denied*, 490 U.S. 1025, 109 S.Ct. 1758, 104 L.Ed.2d 194 (1989). There is no right to counsel who will blindly follow the defendant's instructions. *United States v. Dawes*, 874 F.2d 746, 748 (10th Cir.), *reh'g denied, cert. denied*, 493 U.S. 920, 110 S.Ct. 284, 107 L.Ed.2d 264 (1989), *coram nobis granted on other grounds*, 895 F.2d 1581 (10th Cir.1990). Moreover, a defendant may not manipulate the right to counsel, or the right to self-representation, in order to delay or disrupt a trial. *Berry v. Lockhart*, 873 F.2d 1168, 1171 (8th Cir.1989); *United States v. Flewitt*, 874 F.2d 669, 674 (9th Cir.1989); *United States v. Gallop*, 838 F.2d 105, 108 (4th Cir.), *cert. denied*, 487 U.S. 1211, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *United States v. Thier*, 801 F.2d 1463, 1471 (5th Cir.1986), *modified on denial of reh'g*, 809 F.2d 249 (1987). In a slightly different context, the Supreme Court noted, "The right of self-representation is not a license to abuse the dignity of the courtroom." *Faretta v. California*, 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562, 581 n. 46 (1975) (referring more specifically to a disruptive or obstructionist defendant).

The Third Circuit Court of Appeals has reviewed cases in which a criminal defendant's attempt to substitute counsel or proceed *pro se* would delay the trial. In one case, the Court held,

> Where, on the eve of trial, a defendant seeks new counsel, or, in the alternative, opts to represent himself, the district court must engage in two lines of inquiry. First,

the court must decide if the reasons for the defendant's request for substitute counsel constitute good cause and are thus sufficiently substantial to justify a continuance of the trial in order to allow new counsel to be obtained. If the district court determines that the defendant is not entitled to a continuance in order to engage new counsel, the defendant is then left with a choice between continuing with his existing counsel or proceeding to trial *pro se*, thus bringing into play the court's second stage of inquiry. Since the decision to proceed *pro se* involves a waiver of the defendant's sixth amendment right to counsel, the district court then has the responsibility of ensuring that any decision by the defendant to represent himself is intelligently and competently made....

*United States v. Welty*, 674 F.2d 185, 187 (3d Cir.1982) (citation omitted). Reasons which may constitute "good cause" for the substitution of counsel which delays trial may include a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict with his attorney which leads to an apparently unjust verdict, as well as the timeliness of the motion. *Welty*, 674 F.2d at 188; *see also United States v. Johnson*, 961 F.2d 1488, 1490 (10th Cir.1992) (citing, *inter alia*, *McKee v. Harris*, 649 F.2d 927, 931 (2d Cir.1981), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982)).

The Third Circuit reaffirmed its holding in *Welty* in *McMahon v. Fulcomer*, 821 F.2d 934 (3d Cir.1987), and added, "Certainly 'there is no absolute right to a particular counsel,' ... and the right to chose [sic] a particular lawyer 'must be balanced against the requirements of the fair and proper administration of justice.'" *McMahon*, 821 F.2d at 942 (citation omitted).

Finally, the Third Circuit has held that there was no good cause shown for the substitution of counsel where the reasons expressed by the defendant, without further substantiation, were that counsel had exhibited a lack of enthusiasm for the case and was inadequate in dealing with the issues of the case. *Govt. of the Virgin Islands v. James*, 934 F.2d 468, 470–471 (3d Cir.1991) (relying upon *Welty* ).

The general proposition we apply to Jennings' conduct was stated eloquently yet concisely by the Court of Appeals for the Fifth Circuit: "The right to assistance of counsel, cherished and fundamental though it be, may not be put to service as a means of delaying or trifling with the court." *United States v. Fowler,* 605 F.2d 181, 183 (5th Cir.), *reh'g denied,* 608 F.2d 1373 (5th Cir.1979) (table), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 785 (1980).

### B. Substitution of Counsel

■ In seeking the removal of counsel, Jennings represented to the court that he and counsel disagreed over the defense to be presented. In particular, Jennings objected to the fact that there had not been a notice of insanity defense filed pursuant to Fed. R.Crim.P. 12.2(a), the defense of insanity thereby being waived. For his part, counsel informed the court that Jennings had not told him to file a notice of insanity defense, nor did he believe that a defense of insanity would have any merit. Jennings' basis for presentation of an insanity defense was the stress he claimed to feel from the alleged threats from corrections officers.

The court agreed with counsel that Jennings' claim, even if the facts underlying it were true, did not constitute a meritorious defense of insanity. A criminal defendant asserting insanity as a defense has the burden of proving that "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17. Jennings proffered no basis for believing that he suffers from a severe mental disease or defect, nor that he was unable to appreciate the nature and quality or the wrongfulness of his conduct on February 18, 1993.

■ Counsel did represent to the court, however, that Jennings had discussed with him the stress and tension he allegedly had

felt. It was based upon these discussions that counsel had pursued the self-defense claim, reasoning that the threats constituted sufficient duress to make Jennings feel the need to protect himself. Indeed, had Jennings produced some evidence of the imminence of an attack on himself, the duress evidence would have been material to make his belief in the need for physical resistance reasonable.

Regardless, feeling frightened by threats does not make a person insane (actually, the reaction is completely rational), and counsel was correct that the defense had no merit without a considerably more substantial basis. *Cf. McQueen v. Blackburn,* 755 F.2d 1174, 1178–1179 (5th Cir.) (defendant's insistence on dismissing appointed counsel unreasonable when defendant wanted counsel to follow defendant's instructions blindly, rather than proceed in counsel's own well-considered manner, and attorney defended client "ably and tenaciously"), *cert. denied sub nom. McQueen v. Maggio,* 474 U.S. 852, 106 S.Ct. 152, 88 L.Ed.2d 125 (1985).

To all of the foregoing, it should be added that Jennings' attempt to substitute counsel was a transparent attempt to use the right to counsel to manipulate the judicial system and delay trial. It is part of a pattern of attempts at manipulation by inmates of USP–Lewisburg appearing before the court.

In *United States v. Ron Moore and Carlos Johnson,* 4:CR–92–0322, the defendants attempted an attack on their court-appointed counsel in the marshals' holding cell. The attempted attack followed an unjustified motion for the removal of Ron Moore's appointed counsel. Unable to reach counsel through the restraining barriers in the holding cell, those defendants spat upon and threatened the life of counsel. The court thereafter allowed counsel to withdraw, but only after Moore waived the right to counsel and asserted his right to proceed *pro se,* an election he was entitled to make without taking the described action against counsel.[10]

---

10. After Moore elected to proceed *pro se* and counsel was permitted to withdraw, the court appointed standby counsel for Moore. In retrospect, the latter decision appears to have been a mistake. At trial, counsel argued various mat-

ters for Moore, prompted him to make objections and explained the objections to Moore, and otherwise took an active role in the conduct of trial. In essence, Moore's manipulation of the judicial

This pattern of attempted manipulation by USP–Lewisburg inmates has continued. In fact, three USP–Lewisburg inmates were scheduled to select juries on May 31, 1994. All three moved, on the eve of jury selection, for substitution of counsel and for the filing of notices of insanity defenses. *United States v. Eddie Jennings,* No. 4:CR–94–0018 (the instant case); *United States v. Stephen G. Rollins,* No. 4:CR–94–037 (possession of prohibited objects); *United States v. Goldberg,* No. 4:CR–94–039 (forging the signature of a magistrate judge and making a false statement). None of these inmates had a substantial basis to move to substitute counsel.[11]

Certainly, the fact that one or more inmates has filed a frivolous motion for the substitution of counsel does not indicate that no inmate from the same institution is entitled to new counsel. We cite these numerous cases of identical, frivolous motions which, if granted, would delay and disrupt the efficient administration of justice, only to underline the rationale for careful scrutiny of these motions to ensure that good cause exists for the substitution of counsel and ensuing delay of trial.[12]

### C. Waiver of Counsel

We have noted that a court has the responsibility to ensure that a waiver of counsel is intelligently and competently made. *Welty, supra.* This fundamental rule applies when the defendant asserts the right to proceed *pro se,* since exercise of this right necessarily entails a waiver of the right to appointed counsel.

■ There are, however, instances in which an accused waives by implication the right to be represented by counsel. Deleterious or manipulative conduct on the part of an accused also may amount to a waiver of the right to be represented by counsel. *See,*

*e.g. United States v. Fazzini,* 871 F.2d 635 (7th Cir.) (defendant's failure to cooperate with four successive attorneys appointed to represent him constituted waiver of right to counsel), *cert. denied,* 493 U.S. 982, 110 S.Ct. 517, 107 L.Ed.2d 518 (1989); *United States v. Mitchell,* 777 F.2d 248 (5th Cir.1985) (defendant waived his right to counsel when, in bad faith and for purpose of delay, defendant retained counsel known to have a conflict of interest and failed to retain other counsel), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986); *Richardson v. Lucas,* 741 F.2d 753 (5th Cir.1984) (refusal of defendant to allow any public defender, regardless of competence, to represent him was waiver of right to counsel); *United States v. McFadden,* 630 F.2d 963 (3d Cir.1980) (defendant waived right to counsel by attempting to direct, rather than cooperate with, two attorneys appointed to represent him, by firing those attorneys, by indicating an intent to proceed *pro se,* and by failing to join in a continuance, required due to operation of the Speedy Trial Act, for the appointment of new counsel), *cert. denied,* 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981).

Of course, in none of the cases cited above did the circumstances of the waiver reach the egregious level attained by Jennings. Viewed literally, Jennings struck a blow at his attorney; figuratively, he struck a blow at the orderly and efficient administration of justice, and at the heart of justice itself. No court can carry on its business in an atmosphere of violence, fear and intimidation. As defense counsel aptly stated, if he were to continue to represent Jennings, he would be left with the constant fear of saying the wrong thing or taking the wrong action.

Even more, the threat of violence would affect decisions made by the prosecuting attorney and could reach the bench itself. Witnesses and jurors could be intimidated.

system to obtain the appointment of counsel of choice was successful.

**11.** Counsel for Rollins was permitted to withdraw later due to his inability to spend sufficient time on the case, based upon scheduling conflicts, and that he would be unable to provide effective assistance of counsel. The motion granted, however, was an oral motion to with-

draw by counsel, not the defendant's motion to substitute counsel.

**12.** Jennings' proffer and the list of inmates in SHU on February 18, 1993, appended to Jennings' petition for writs of habeas corpus ad testificandum indicate that Moore, Johnson, and Jennings all were in SHU at that time.

Even more, the public perception of the courts would be irrevocably altered, no longer as a place where fairness and justice govern and individual liberties are protected, but to a place where might makes right.[13] Federal courts are isolated from political influence by the separation of powers doctrine and the appointment, rather than election, of judicial representatives. Just as the courts must be free from the influence of political might, so too they must be isolated from physical might and the threats which that might represents. No civilized society can accept the threatened or actual use of force within its courts and expect those courts to operate effectively or fairly for all parties involved.

Having decided that the use of physical force within the walls of the courthouse simply is unacceptable, the question remains how to react to the use of violence as a means for gaining a favorable ruling or other advantage in the course of litigation.

As reflected in the opinions cited above concerning the manipulation of the right to counsel, the most appropriate response to this tactic is to refuse to allow the manipulation, in the sense that the defendant should not be provided with the advantage sought. In this case, this response clearly is the most appropriate, based upon the gravity of Jennings' conduct. Violence in the courtroom cannot be countenanced, and it is appropriate, when the violence is a part of a manipulation of the right to appointed counsel, simply to deprive the defendant of that right.

Even when the violence is not part of a manipulation, it is appropriate to remove from a defendant's reach that which he has sought to harm or that which he has misused or abused, i.e. his attorney. Since the defendant has demonstrated that he cannot be trusted to respect the physical well-being of an attorney, no substitute counsel should be appointed, even assuming that there would be an attorney willing to accept the appointment.

Of course, it can be argued that the court has not inquired, prior to deeming the right to counsel waived, whether the waiver is knowing and intelligent. The answer to this is that the court is unable to make a preliminary determination when the timing of the waiver is determined by the defendant.

We are aware that deeming the right to counsel as waived by the conduct of a defendant is an extreme sanction. However, the conduct of Jennings in this instance was extreme and outrageous. The sanction chosen is appropriate under the circumstances and is commensurate with both the nature and extent of Jennings' conduct. In this way, the sanction is analogous to other situations in which sanctions are imposed. *See, e.g.,* Fed. R.Civ.P. 11(c)(2) (party who files a frivolous pleading or motion pays the cost of responding to the pleading or motion or amount sufficient to deter repetition of the conduct); Fed.R.Civ.P. 26(g)(3), 30(d)(2), 30(g)(2) 37(a)(2)(A), 37(a)(4) (party who abuses discovery process may be ordered to pay costs associated with the abuse); *Schmid v. Milwaukee Electric Tool Corp.,* 13 F.3d 76, 78 (3d Cir.1994) (sanctions may be imposed on a party responsible for the spoliation of evidence ranging from admission at trial of evidence of the "spoliation inference" to preclusion of key evidence, depending on the degree of fault of the responsible party).

We also recognize that other forms of sanction exist, such as the use of the contempt power. In Jennings' case, however, the use of the contempt power would be futile. Jennings is an indigent inmate, serving a life sentence, so that the threat of fines or incarceration would have no effect upon him. This point was brought home by Carlos Johnson who, during the trial with codefend-

---

**13.** More extreme examples of the impact violence may have on the judicial system exist in Italy and Colombia, where the ongoing battles against the Mafia and the drug cartels make grim news. *See, e.g.,* Jennifer Cooke, *Australia: The NCA Strikes a Nerve,* Sydney Morning Herald, March 5, 1994, at 25; Nicholas Farrell, *Voters Reject Dons of Corleone: Rainbow of Hope Arches over a Sicilian Town in the Shadow of Death,* Sunday Telegraph, November 28, 1993, International Section at 23; Agence France Press Release, *Clean Hands Probe Turns Finger on Judiciary,* October 22, 1993; David Adams, *Vicious Killer Was Venerated as a Robin Hood by Grateful Poor,* The Times of London, December 4, 1993; *World Court for Drug Lords,* The New York Times, August 1, 1992, Section 1 at 22.

ant Ron Moore discussed above, was threatened with contempt due to misconduct before the court. The reaction of Johnson was, to paraphrase, "What are you going to do, throw me in jail?" These inmates already experience the most restrictive form of incarceration provided by the BOP, and an order directing further incarceration would be to no avail in deterring repetition of their misconduct.

In short, then, Jennings' conduct was, at an absolute minimum, unacceptable: it was a threat to the operation of the judicial system and the public confidence therein. The response taken by the court was a measured response to the conduct. It removed from Jennings' control that which he sought to abuse physically and misuse legally. And it is a means, perhaps the only means, of deterring repetition of the conduct by Jennings or others similarly situated. We hold that an indigent defendant who, without provocation or justification, physically assaults court-appointed counsel, thereby waives the right to appointed counsel. Counsel will be removed by the court, no substitute counsel will be appointed, and the defendant will proceed *pro se.*

### VI. Absence from the courtroom during Jury Selection

■ On June 1, 1994, Jennings was informed of the ruling by the court that he had, by his conduct, waived the right to counsel, that no substitute counsel would be appointed, and that he would proceed *pro se.* As discussed at length above, Jennings' reaction was a tirade and threats against his former counsel, corrections staff, and the prosecutor. The jury panel was not present during this outburst. The court then asked Jennings if his conduct would continue in the presence of prospective jurors, and Jennings indicated that it would. Jennings therefore was removed from the courtroom.

Because Jennings was acting as his own attorney, however, his absence from the courtroom in effect would be a jury selection *in absentia.* Therefore, the court arranged for the wiring of the sound system in such a manner that Jennings could hear the proceedings from the holding cell in the marshal's office, to which he had been removed. Also, Deputy Marshal Montville was sworn to ensure that he would relay faithfully messages from the court to Jennings, and vice versa. Jennings also was provided with a list of the jury panel, and was offered paper and writing utensils. In this way, Jennings was provided with the ability to participate in the proceedings without his behavior affecting the safety and decorum of the courtroom.

Throughout the proceedings, the court sent messages to Jennings for the purpose of determining whether he wished to participate in the proceedings. Jennings' initial reaction was to throw water at the speakers through which the proceedings could be heard. He refused to take the list of names comprising the jury panel. Jennings also repeatedly indicated his refusal to participate further, and at one time threatened to throw a cup of urine at the marshal when he brought a message from the court. Jennings later simply refused to respond meaningfully to the inquiries of the marshal and to the court.

Based upon all of this unruly conduct, the court was unable to elicit from Jennings in any meaningful manner his desires regarding the selection of jurors. The court therefore struck jurors in place of Jennings, beginning with the last names drawn.

Under Fed.R.Crim.P. 43(a), the presence of a criminal defendant at the impaneling of the jury is required, subject to the other provisions of the rule. This provision of Rule 43(a) serves two major purposes: (1) it allows the defendant to give advice or suggestions to his lawyer concerning the jury panel; and (2) it allows the defendant to exercise effectively his peremptory challenges. *United States v. Camacho,* 955 F.2d 950, 953 (4th Cir.1992) (citations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 571, 126 L.Ed.2d 470 (1993). The defendant's absence from the impaneling of the jury frustrates the fairness of the trial. *Id. Cf. United States v. Alessandrello,* 637 F.2d 131, 138 (3d Cir.1980), *cert. denied,* 451 U.S. 949, 101 S.Ct. 2031, 68 L.Ed.2d 334 (1981).

Rule 43, however, goes on to state an exception to this general rule, allowing the court to remove from the courtroom a defen-

dant who persists in disruptive conduct. Rule 43(b)(2).[14] Jennings was disruptive at the time of the hearing on his motion for the substitution of counsel, continued his disruptive behavior, was warned that persistence in such conduct would warrant removal from the courtroom, and persisted in his unruly conduct. The removal from the courtroom therefore was consistent with Rule 43.

Jennings was not, however, barred from participating in the proceedings. His own conduct, not any limitation placed by the court, prevented his participation in the jury selection process. Jennings' absence from and failure to participate in jury selection on June 1, 1994, did not violate either Rule 43 or the Due Process Clause. *Cf. Camacho,* 955 F.2d at 952–953 (citing *United States v. Gagnon,* 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam); *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)).

### VII. IMPOSITION OF SENTENCE

After the jury verdicts were returned, the court excused the jury and proceeded immediately to sentencing. Neither the government nor Jennings objected to this course of action, despite a specific inquiry from the court. This section of the instant memorandum is intended both to memorialize the rationale for immediate sentencing and to make the findings requisite for our chosen course of action.

#### A. Time of Sentencing

■ Under the Federal Rules of Criminal Procedure, sentence is to be imposed by the court "without unnecessary delay." Fed. R.Crim.P. 32(a)(1). Delays are necessary "when there is a factor important to the sentencing determination that is not then capable of being resolved ..." *Id.* General-

ly, before imposing sentence, the court is required to: (1) direct that a presentence investigation report be prepared, Rule 32(c)(1); (2) provide a copy of the presentence report to the defendant, counsel for the defendant and counsel for the government, Rule 32(c)(3)(A), 32(a)(1); (3) allow an opportunity to the defendant and defense counsel to review and discuss the report and respond thereto, Rule 32(a)(1)(A), (B); (4) allow counsel to speak on behalf of the defendant, Rule 32(a)(1)(B); permit the defendant his right of allocution, Rule 32(a)(1)(C); and allow counsel for the government an opportunity to address the court, Rule 32(a)(1).

There is an exception to the requirement that a presentence investigation report be prepared when "the court finds that there is in the record information sufficient to enable the meaningful exercise of sentencing authority pursuant to 18 U.S.C. [§] 3553, and the court explains this finding on the record." Rule 32(c)(1).

After the verdicts were returned and the jury excused, we indicated our intent to proceed immediately to sentencing and waive the preparation of a presentence investigation report because a report had been prepared approximately one year before, related to No. 4:CR–92–204–01. Jennings having been incarcerated in the interim, his circumstances, at least those material to the imposition of sentence, would not have changed substantially. Although some findings were placed on the record at that time, for the sake of clarity and completeness, we set forth the following findings in full.

#### B. Findings by the Court
#### THE COURT MAKES THE FOLLOWING FINDINGS AND CONCLUSIONS:

1. Defendant Eddie Jennings is currently serving a life sentence, subject to parole, for

---

14. Specifically, the governing provisions of Rule 43 state:

   **(a) Presence Required.** The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

   **(b) Continued Presence Not Required.** The further progress of the trial to and including the return of the verdict shall not be prevented

and the defendant shall be considered to have waived the right to be present whenever a defendant, initially present,

   .    .    .    .    .

   (2) after being warned by the court that disruptive conduct will cause the removal of the defendant from the courtroom, persists in conduct which is such as to justify exclusion from the courtroom.

   .    .    .    .    .

Fed.R.Crim.P. 43.

the murder of a bank security guard in connection with a bank robbery.[15] At the time defendant pled guilty to the bank robbery with killing, he also pled guilty to kidnapping, robbery, rape, and oral copulation, and was sentenced to a concurrent fifteen-year sentence.

2. Defendant has continued in a pattern of violent behavior, including the charges for which defendant was sentenced on February 18, 1993,[16] the unprovoked attack against court-appointed counsel on May 31, 1994, and the charges of which defendant was found guilty on June 7, 1994.

3. On June 1, 1994, prior to jury selection in the above-captioned case, defendant threatened to do physical harm to the Assistant United States Attorney prosecuting the case, to corrections officers at the United States Penitentiary at Lewisburg, Pennsylvania, and to former defense counsel.

4. Due to defendant's unruly and disruptive behavior, he was removed from the courtroom and placed in a holding cell in the United States Marshal's Office. *See* Fed. R.Crim.P. 43(b)(2).

5. Defendant was able to hear the jury selection proceedings in the holding cell, and was given an opportunity to participate by the court.

6. Defendant's reaction to the opportunity to participate was further unruly behavior, including throwing water at the speaker through which the courtroom proceedings could be heard, directing foul language at the marshal who relayed messages from the court to defendant, and threatening to throw a cup filled with urine at the marshal.

7. Defendant poses a serious physical danger to any person in close proximity to him, based upon his past assaultive behavior, his threatening demeanor, and a clear, present ability to carry out threats of harm.

8. Presentation of the case to the jury in the instant matter began and ended on June 7, 1994, in the Federal Building, Williamsport, Pennsylvania.

9. Defendant participated in the trial on June 7, 1994, acting as his own attorney, and was transported without incident to and from the courthouse.

10. A presentence investigation report was prepared prior to defendant's sentencing in No. 4:CR–92–204–01.

11. The factors underlying defendant's sentence in No. 4:CR–92–204–01 have not changed significantly due to defendant's intervening incarceration.

12. Due to defendant's waiver of the right to counsel, due to the serious physical threat presented by defendant, and due to the relatively recent preparation of a presentence investigation report, the preparation of a new presentence report would be a meaningless, unnecessary and risky exercise, in that:

(a) Defendant's aggressive demeanor and behavior, coupled with his ability to carry out previously-expressed threats, would place the probation officer conducting the interview at great personal risk, as well as creating risk for corrections officials at the time of the interview;

(b) The presentence report previously prepared may serve the same purpose as any newly-prepared report.

13. Pursuant to Fed.R.Crim.P. 32(c)(1), we find that there was in the record at the time of sentencing information sufficient to enable the meaningful exercise of sentencing authority pursuant to 18 U.S.C. § 3553; our reasons for not directing the preparation of a new presentence report are set out at length in the foregoing paragraphs.

14. No presentence investigation report was prepared for the purpose of imposing sentence in the instant case.

15. The jury having returned a verdict of guilty on all Counts of the instant indictment, sentence was imposed following the return of a verdict for the following reasons:

---

15. The presentence report prepared relative to No. 4:CR–92–204–01 notes that the killing of the security guard was "without provocation." Presentence Report at 8, ¶ 44.

16. Jennings' assault on a corrections officer, for which he was sentenced on February 18, 1993, is described in the presentence report as "without warning" and "unprovoked." Presentence Report at 3–4, ¶¶ 6, 7.

(a) As noted above, the preparation of a presentence investigation report would be a futile effort, no new, material information would be provided thereby, and no presentence investigation report will be prepared;

(b) The court has available information on the record sufficient to enable a meaningful exercise of sentencing authority, and any delay in the imposition of sentence for further investigation would be a futile effort and an unnecessary delay;

(c) The physical risk posed by defendant and the cost of transporting him from the United States Penitentiary at Marion, Illinois, to which he is designated, outweigh any interest defendant may have in delaying the imposition of sentence.

16.  Defendant has had an opportunity to review the presentence investigation report, a copy of it having been provided in the prior proceedings, and makes no objection to the use of the information contained in the presentence investigation report in the instant proceedings.

17.  Objections to the information contained in the presentence investigation report were resolved in the prior proceedings.

18.  The only information to be added to the presentence report is the fact of defendant's conviction for assault on a federal officer and destruction of government property in No. 4:CR–92–204–01, of which the court takes judicial notice.

In short, our findings indicate that the preparation of a presentence investigation report would be futile, and therefore the delay for preparation of a report and responses thereto would be futile and unnecessary. Further, since Jennings poses a significant threat of harm to any person coming into close contact with him, a delay for which no apparent reason existed would have been quite ill-advised.  The prior presentence report served to provide all of the information necessary for a meaningful exercise of the sentencing authority.  Sentence therefore was imposed immediately upon the return of the jury's verdicts.

### C.  Computation of Sentence

Using the United States Sentencing Guidelines ("USSG") and the presentence investigation report, the following calculations were made:

**Counts One and Two**

| | |
|---|---|
| Base Offense Level: | 15 [17] |
| Specific Offense Characteristics: | |
| More than minimal planning: | 2 [18] |
| Dangerous weapon otherwise used: | 4 [19] |
| Bodily injury: | 2 [20] |
| Offense Level: | 23 |
| Adjustments: | |
| Victim-related: | 3 [21] |
| Obstruction: | 2 [22] |
| Adjusted Offense Level: | 28 |

**Count Three**

| | |
|---|---|
| Base Offense Level: | 13 [23] |
| Specific Offense Characteristics: | |
| None | 0 |
| Offense Level: | 13 |
| Adjustments: | |
| Obstruction: | 2 [24] |
| Adjusted Offense Level: | 15 |

**All Counts**

| | |
|---|---|
| Units Assigned: [25] | |
| Count One: | 1 |
| Count Two: | 1 |
| Count Three: | 0 |
| Total: | 2 |
| Highest Adjusted Offense Level: | 28 [26] |
| Combined Adjusted Offense Level: | 30 [27] |

---

**17.**  USSG § 2A2.2(a).

**18.**  Blocking out all of the light in the cell, obtaining possession of the shank and preparing for its use by wrapping the strips of cloth around the wrists.  USSG § 2A2.2(b)(1).

**19.**  The shank.  USSG § 2A2.2(b)(2)(B).

**20.**  The puncture wounds suffered by the corrections officers on the forced cell movement team.  USSG § 2A2.2(b)(3)(A).

**21.**  The official status of the victims.  USSG § 3A1.2(a).

**22.**  The assault on counsel and the disruptive behavior both in the courtroom and in the holding cell.  USSG § 3C1.1.

**23.**  USSG § 2P1.2(a)(2).

**24.**  See n. 24, supra.

**25.**  USSG § 3D1.4(a).  Counts are grouped separately pursuant to USSG § 3D1.2(d).

**26.**  USSG § 3D1.4.

**27.**  See n. 28, supra.

Criminal
History

| Date Sentence Imposed | Offense | Points[28] |
|---|---|---|
| 4/6/74 | Disturbing the Peace | 0 |
| 11/12/75 | Grand Theft/Person | 0 |
| 11/14/77 | Robbery | 3 |
| 12/8/80 | Bank Robbery with Killing | 3 |
| 8/24/81 | Kidnapping, Rape, Oral Copulation | 3 |
| 2/18/93 | Assault on Federal Officer, Destroying Govt. Property | 3 |
| | | — |

| | |
|---|---|
| Criminal History Points: | 12 |
| Additional Criminal History Points: | |
| Instant offense committed while imprisoned: | 2[29] |
| Offense committed while imprisoned for offense committed while imprisoned for sentence counted under § 4A1.1(d): | 1[30] |
| | — |

| | |
|---|---|
| Total Criminal History Points: | 15 |
| Criminal History Category: | VI[31] |

With a combined adjusted offense level of 30, and a criminal history category of VI, the sentencing range for the instant offense was 168 to 210 months. USSG Ch. 5, Pt. A. The court imposed a sentence at the top of the range for deterrence value.

## VIII. CONCLUSION

Each of the issues set forth in Section II of this memorandum has been addressed and the court holds as follows:

(1) An individual who believes that there will be an attack against his person at some unknown point in time is not under a reasonable fear of imminent death or serious bodily harm, so that a claim of self-defense to assault charges under these circumstances is not valid; that is, "A preemptive strike does not constitute valid self-defense." An indigent defendant is not entitled to writs of habeas corpus ad testificandum to produce testimony regarding the factual basis of a defense which is untenable as a matter of law, accepting as true the facts proffered by the defendant. The facts proffered by Jennings would not have established a valid claim of self-defense, and the petition for writs of habeas corpus ad testificandum was denied.

(2) Assault on a federal officer under 18 U.S.C. § 111 is a general intent crime to which the defense of voluntary intoxication does not apply. Jennings' proffered testimony concerning this defense was insufficient as a matter of law to warrant the granting of a petition for writs of habeas corpus ad testificandum for the purpose of establishing the factual basis for voluntary intoxication.

(3) An indigent defendant who, without provocation or justification, physically assaults court-appointed counsel thereby waives the right to appointed counsel.

(4) A presentence investigation report, prepared for an earlier prosecution of the defendant, near in time to the imposition of sentence in the second case, and without a material change in circumstances on the part of the defendant, provides a basis sufficient to enable meaningful exercise of the sentencing authority of 18 U.S.C. § 3553. Significant security concerns and the futility of a new presentence investigation report may provide the basis for dispensation of the requirement of the preparation of a presentence investigation report in the second case. A sentence may be imposed consistently with Fed.R.Crim.P. 32 immediately following the return of a verdict when there is in the record information sufficient to enable the meaningful exercise of sentencing authority, when that information has been available to both the government and the defense, when neither side objects to the immediate imposition of sentence, and when significant security concerns are implicated by a delay in sentencing.

Our earlier rulings in the instant case were consistent with and based upon the foregoing holdings.

---

**28.** USSG § 4A1.1(a), 4A1.2(e).

**29.** *See* n. 30, *supra.*

**30.** *See* n. 30, *supra.*

**31.** USSG Ch. 5, Pt. A.