**UNITED STATES of America**

v.

**Ronald J. GOLDBERG, Defendant.**

No. 4:CR–94–0039.

United States District Court,
M.D. Pennsylvania.

Aug. 9, 1996.

Frederick E. Martin, Assistant United States Attorney, Williamsport, PA, for United States of America.

Thomas A. Thornton, Assistant Federal Public Defender, Williamsport, PA, for defendant.

### SENTENCING MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

On March 16, 1994, a grand jury sitting in the Middle District of Pennsylvania returned a two-count indictment against defendant Ronald J. Goldberg charging him with forging the signature of a magistrate judge in violation of 18 U.S.C. § 505 (Count One), and with knowingly making a false representation concerning a matter within the jurisdiction of a department of the United States in violation of 18 U.S.C. § 1001 (Count Two).

A jury returned verdicts of guilty on both counts. Goldberg was sentenced to concurrent terms of 24 months. The Court of Appeals for the Third Circuit reversed the conviction and sentence, and remanded for a new trial. *United States v. Goldberg,* 67 F.3d 1092 (3d Cir.1995). The second jury also found Goldberg guilty of both counts. Goldberg was sentenced on August 2, 1996, to two concurrent terms of incarceration of 30 months, to be followed by a term of supervised release. The terms of incarceration were imposed to run consecutive to any term of incarceration previously imposed.

In determining the appropriate sentence, the court included a 2–point enhancement to Goldberg's Offense Level for obstructing the prosecution as well as a 2–point upward departure for obstruction of justice. This memorandum is intended to place on the record the court's reasons for doing so. The same applies to a number of motions pending at the time of sentencing, the disposition of which and rationale underlying the disposition of which will be set forth below.

### DISCUSSION:

#### I. STATEMENT OF FACTS

In disposing of a motion by Goldberg for judgment as a matter of law under Fed. R.Crim.P. 29(c), we reviewed the evidence presented at trial as follows (with minor revisions):

Accepting the evidence presented in the light most favorable to the government as the prevailing party, *see United States v. Salmon,* 944 F.2d 1106, 1113 (3d Cir.1991), *cert. denied sub nom. Washington v. United States,* 502 U.S. 1110, 112 S.Ct. 1213, 117 L.Ed.2d 451 (1992), as set forth in our Memorandum and Order of Court dated March 20, 1996, the evidence produced at trial established the facts which follow.

On January 19, 1993, defendant Ronald J. Goldberg arrived as an inmate newly assigned to the United States Penitentiary at Lewisburg, Pennsylvania, and was assigned to the portion of the prison designated SAN–East, F–Block. After an admissions and orientation process, Goldberg was assigned effective February 5, 1993, to "automatic heating and ventilation," which involves both training in and work related to that area. The job assignment was made by Goldberg's "unit team" after a review. For some reason not established, Goldberg was assigned to UNICOR, or the federal prison industries, for one day doing "final assembly" and then was reassigned to automatic heating and ventilation.

Effective March 29, 1993, Goldberg was assigned to the law library due to an impend-

ing deadline in a civil suit Goldberg had filed in Florida against the Federal Bureau of Prisons (BOP). Such an assignment entails Goldberg's presence in the law library for the purpose of doing legal work, but does not mean that he actually would be an employee, such as a law clerk, in the law library. He was required to be present in the law library during working hours, however. Goldberg's assignment there lasted until April 13, 1993, the deadline which he was to meet. He then returned to his job assignment in automatic heating and ventilation.

On or about April 13, 1993, Goldberg entered the office of Trevor Holder, then a case manager at USP–Lewisburg and now a Lieutenant on the corrections staff at the Federal Correctional Institution at Raybrook, New York. Goldberg presented Holder with two documents. One was an "inmate request to staff," a "cop-out" as it is known in the prison, by which Goldberg requested assignment to the law library. The second document was styled an order signed by Magistrate Judge Charlene H. Sorrentino of the United States District Court for the Southern District of Florida. The order purportedly granted to Goldberg an extension of time in which to respond to a motion in Goldberg's suit against the BOP.

In actuality, the order was a fake. The docket of the case as well as the file maintained by the Clerk of Court for the Southern District of Florida indicate that no such order ever was issued in the case. In addition, a deputy clerk from that court employed in the *pro se* division testified as to a number of differences between the order presented by Goldberg and orders which would have been issued by Magistrate Judge Sorrentino.

When he received the false order, Holder set it aside while he attended to other business. Upon review of the document about twenty minutes later, Holder was suspicious because it did not have either a stamp or a seal, either of which in Holder's experience would be on an actual court order. He therefore took both the false order and the cop-out to Donald C. Troutman, a case manager and acting unit manager at USP–Lewisburg. At the time, Troutman was Holder's immediate supervisor. Holder gave both documents to Troutman and told Troutman that the order did not look real, noting the lack of a seal or stamp.

Troutman reviewed the order and also felt that it did not look right. The photocopy quality was poor, and the order granted a long extension. In general, Troutman simply felt that the order seemed "wrong." Because he questioned the authenticity of the order, Troutman took it to Michael Tafelski, Esquire, a "staff attorney" at USP–Lewisburg. Based on Troutman's questions regarding the document, as well as his own doubts, Tafelski called the office of the Clerk of Court for the Southern District of Florida. After discussion with that office, the Assistant United States Attorney representing the BOP in Goldberg's civil suit, and the office of Magistrate Judge Sorrentino, Tafelski concluded that the order was fake. He documented the steps taken and his conclusion in a memorandum to Troutman.

About a week later, Tafelski went to the dining hall for the noon meal. It is the practice of staff at USP–Lewisburg to make themselves available during meals to answer questions from inmates and to resolve any potential problems. Goldberg approached Tafelski and asked him to step aside to speak privately. Goldberg also asked if what he told Tafelski could remain between them and not be put into a memorandum. Tafelski informed Goldberg that this was not possible, that he might memorialize the discussion and that any memorandum could be used as appropriate. Despite the admonition, Goldberg stated that he was sorry for the order, and that the use of "paper" was his way of acting out.

At the re-trial, the government presented evidence in the form of the testimony of David W. Attenberger, Supervisory Special Agent for the Federal Bureau of Investigation. Attenberger is a document examiner who works in the FBI crime laboratory in Washington, D.C. It was Attenberger's opinion that Magistrate Judge Sorrentino's signature was copied from an original order in the civil case. In essence, the process would involve typing the fake order, placing a cut-out copy of the signature in the appropriate spot, and making another photocopy.

Attenberger concluded that the two signatures, that on the fake order and that on an actual order from the civil file, were so closely alike that it was highly improbable that the false signature was written by hand on the fake order.

To rebut this testimony, Goldberg presented the testimony of Duane Munera, an inmate who was incarcerated at USP–Lewisburg during the appropriate time. On the stand, Munera made a free-hand copy of the signature of Magistrate Judge Sorrentino which credibly reproduced the signature. In response to a suggestion by the prosecutor that he had practiced signing the name, Munera copied the signature of a court security officer.

There were, of course, minor differences between the original signatures and those produced by Munera. It is not clear whether Attenberger would have concluded that the signature on the original order and that on the fake order were more alike than those made by Munera in the courtroom, since Attenberger did not testify after Munera.

For present purposes, we presume that the jury accepted the evidence presented by the government as the verdict winner and that the jury rejected the testimony of Munera. We note, however, that even if the jury accepted the testimony of Munera that he forged Magistrate Judge Sorrentino's signature, the verdict need not change. The jury could have found Goldberg guilty of aiding and abetting Munera's forgery, which would make Goldberg liable as a principal. The manner in which the fake order was created, then, has no legal effect on the outcome of the case.

We turn now to the factual disputes and legal issues facing the court for sentencing purposes.

## II. FINDINGS OF FACT

### A. Pre–Trial Conduct: First Trial

As noted in Memoranda and Orders dated July 18, 1996, the conduct to be considered by the court for sentencing purposes is not limited to that occurring after the reversal by the Third Circuit. "A defendant's attempt to obstruct justice does not disappear merely because his conviction has been reversed on grounds having nothing to do with the obstruction. . . . We hold that the reversal of a conviction on other grounds does not limit the ability of a sentencing judge to consider a defendant's conduct prior to the reversal in determining a sentence on remand." *United States v. Has No Horse,* 42 F.3d 1158, 1159–1160 (8th Cir.1994).

Although in this instance the obstructive conduct is related to the reversal, the reversal was for our failure to hold a hearing on the threat to counsel before allowing counsel to withdraw, not because the conduct did not take place. Despite being related, the reversal still is based on other grounds than the obstruction of justice enhancement. Obstructive conduct does not become any less so simply because the court takes action prematurely. For this reason, we make the following findings of fact with respect to Goldberg's conduct before the first trial:

1. On May 27, 1994, Goldberg, acting *pro se,* filed a document captioned, "Emergency Motion for Removal of Counsel and for Continuance of Trial or in the Alternative to Proceed *In Propria Persona,*"[1] which in effect was a motion to substitute counsel.

---

**1.** *"In propria persona"* is the term used by Goldberg, and is not appropriate in a technical sense, although the court has seen the term commonly used by inmates proceeding *pro se.* According to Black's Law Dictionary, it was formerly a rule of pleading that an attorney, as an officer of the court, could not appear before a court which did not have jurisdiction. By appearing with an attorney, the party was admitting the jurisdiction of the court. Any challenge to jurisdiction would have to be made without an appearance by counsel. A person making such a challenge, then, would appear "in their own per-

son," or *in propria persona.* Black's Law Dictionary 792 (6th ed. 1990).

On the other hand, a person appearing at any time without counsel is proceeding *pro se. Id.* at 1221. Thus, a non-attorney appearing to challenge jurisdiction was both *in propria persona* and *pro se,* but the designation of their status as *in propria persona* would not survive the determination of jurisdiction, and they would be proceeding solely with *pro se* status thereafter if no counsel appeared.

Regardless, the rule of pleading having long since changed, the term *in propria persona* is outdated, at least as having a separate legal

2. On May 31, 1994, prior to jury selection, the court conducted an *ex parte* hearing on Goldberg's motion for the purpose of clarifying Goldberg's reasons for desiring substitute counsel and to determine whether there was a factual basis for the substitution.

3. Following a colloquy, the court denied Goldberg's motion as Goldberg had no basis to be unhappy with counsel's performance. In so doing, we found that a number of motions Goldberg was insisting that counsel file were without merit so that counsel properly refused to file them, including:

(a) a motion for a continuance of jury selection and trial;

(b) an *ex parte* motion for expert fees;

(c) a motion to dismiss based on the Double Jeopardy Clause;

(d) a motion for a specific request under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963);

(e) a motion to suppress statements made by Goldberg, spontaneously, to a staff attorney at USP–Lewisburg;

(f) a motion for "access to the court";

(g) a motion for *in camera* inspection of grand jury records for *Brady* material;

(h) a motion for a bill of particulars;

(i) a motion for early disclosure of material under the Jencks Act;

(j) a motion to review all witnesses' statements even if not used at trial by the government;

(k) a motion to produce employment files of BOP personnel and to produce the government's witness list;

(*l* ) a motion to dismiss the indictment for an illegally constituted grand jury;

(m) a motion to produce evidence of prior crimes, wrongs and bad acts under Fed. R.Evid. 404(b); and

(n) a motion to dismiss the indictment based on selective prosecution.

4. Goldberg's motion as it related to proceeding *pro se* also was denied because Goldberg did not make a knowing and voluntary waiver of the right to counsel.

5. Jury selection took place on May 31, 1994, with the full participation of counsel.

6. On Thursday, June 2, 1994, Goldberg placed a call from USP–Lewisburg to the offices of his court-appointed attorney, Bradley Lunsford, Esquire, for the purpose of passing on the file to new counsel.

7. Lunsford indicated to Goldberg that he would not relinquish the file until new counsel had entered an appearance.

8. Goldberg demanded that Lunsford move to withdraw as counsel and gave reasons to be presented to the court, including the incompetence of counsel.

9. Lunsford refused to move to withdraw, noting that the court already had denied such a motion and that there was no basis for reconsideration.

10. Goldberg then stated that he would use the money which otherwise would have been spent on new counsel to have someone outside USP–Lewisburg "get" Lunsford.

11. When Lunsford asked what Goldberg meant, Goldberg responded that Lunsford knew what was meant and that Lunsford did not know with whom he was dealing.

12. Goldberg's statements on June 2, 1994, constituted a clear and unequivocal threat to do serious bodily harm to Lunsford, which threat could be interpreted as a threat to the life of counsel.

13. The threat to do harm to counsel through the agency of a third party was

meaning. Courts have continued to use the phrases *in propria persona* and *pro se* interchangeably and synonymously. *Savage v. Estelle,* 924 F.2d 1459, 1460 n. 1 (9th Cir.1990) ("no legal distinction" between the phrases in context of self-representation), *cert. denied,* 501 U.S. 1255, 111 S.Ct. 2900, 115 L.Ed.2d 1064 (1991); *Liebig v. Kelley–Allee,* 923 F.Supp. 778, 778 n. 1 (E.D.N.C.1996).

The Supreme Court appears to prefer "self-representation," perhaps because its discussions generally involve the right of self-representation, *Godinez v. Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993); *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), but the Court also has used the phrase *"pro se"* when appropriate. *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). In the cases cited throughout this memorandum, the Third Circuit uses the term *"pro se"* when discussing self-representation. This court therefore will use the same phrase.

consistent with Goldberg's assertions made at the time (although inconsistent with his current assertions) that he was not indigent, but in fact possessed considerable assets.

14. Goldberg's threats, therefore, were coupled with the apparent ability to accomplish physical harm to counsel through the agency of a third party hired by Goldberg for such purpose.

15. As a consequence of the threats made by Goldberg, Lunsford was placed in fear of his own life and in fear for the safety of his family.

16. Because of the fear in which Goldberg had placed Lunsford, Lunsford did not feel capable of representing Goldberg consistent with his duties of both competence and loyalty.

17. The court allowed Lunsford to withdraw following Lunsford's oral motion to do so.

18. Goldberg's conduct was intended to, and did, disrupt and obstruct the proceedings in this court.

19. The court allowed Goldberg to challenge the factual basis for allowing Lunsford to withdraw, although after the withdrawal was permitted.

20. This court's error in not holding a hearing before allowing Lunsford to withdraw does not alter the fact that Goldberg acted to obstruct the administration of justice.

21. Goldberg also has been given an opportunity to challenge the factual basis for a finding of obstruction in the threat to Lunsford by the court's order of July 18, 1996, which specifically informed Goldberg that conduct related to the first trial was considered by the court to apply to the sentence to be imposed after the second guilty verdict.

22. On June 14, 1994, Goldberg represented to the court that officials at USP–Lewisburg had interfered with his access to the law library and to witnesses by separating him from his housing unit and general population inmates.

23. Actually, when Goldberg was returned to USP–Lewisburg on June 13, 1994, he overheard the time at which the marshals would be transporting him to court in the morning, so that his separation was a reasonable, standard security precaution because such information can be used in an escape attempt. *See* N.T. 6/14/94 at 225–226.

24. The misrepresentation was material because it was made to obtain court intervention in housing and access to facilities to permit Goldberg to represent himself.

### B. Second Trial

1. The Third Circuit reversed the judgment of conviction which followed the first trial of this case on October 16, 1995, and remanded to this court for further proceedings. *United States v. Goldberg*, 67 F.3d 1092 (3d Cir.1995).

2. Although reversing the judgment, the Third Circuit affirmed our finding that there was not good cause to substitute counsel and delay the first trial. *Id.* at 1098–1099.

3. Supporting our finding that good cause for the substitution did not exist was a finding that motions which Goldberg insisted be filed by Lunsford were without merit. *Id.* at 1098 (citing *United States v. Goldberg*, 855 F.Supp. 725, 730–732 (M.D.Pa.1994)).

4. On November 24, 1995, the court received from Goldberg a letter indicating that he was "pending possible eye surgery" and requesting that a writ for his return for the second trial be deferred for an indefinite period. Record Document No. 93.

5. The same letter indicated that Goldberg wanted counsel appointed to represent him, and that the firm of Rieders, Travis, Mussina, Humphrey & Harris would be acceptable to Goldberg.

6. Members of the Rieders, Travis firm had been involved in cases involving serious charges against USP–Lewisburg inmates in which the inmates were acquitted. *See United States v. Vasquez*, 889 F.Supp. 171 (M.D.Pa.1995) (inmate charged with murdering another inmate; acquittal after jury trial in which Jeffrey C. Dohrmann, Esquire, an associate of Rieders, Travis, represented the defendant); *United States v. Gambina*, 4:CR–92–0093 (M.D.Pa.) (USP–Lewisburg inmate and wife charged with conspiring to

effect escape of inmate; acquittal of both defendants after jury trial in which Ronald C. Travis, Esquire, of the Rieders, Travis firm represented inmate's wife).

7. The court declined to continue generally a criminal matter, and directed Goldberg to complete a financial affidavit for the purpose of appointing counsel. Goldberg was provided with a blank form of the financial affidavit. Order of Court dated November 30, 1995 (record document no. 94).

8. No financial affidavit having been received from Goldberg, the court continued jury selection from January 3, 1996, to February 14, 1996, and scheduled a hearing with respect to:

(a) whether Goldberg qualified financially for the appointment of counsel;

(b) if not, whether Goldberg would elect to retain counsel or to proceed *pro se;*

(c) the nature, extent and required timing of medical treatment prescribed for Goldberg; and

(d) the dates on which Goldberg is required to be present in Florida for sentencing.

9. At the hearing, held January 4, 1996, Goldberg indicated that he had not received the order of November 30, 1995, nor the form financial affidavit, apparently due to his movement by the BOP and subsequent disruption of mail delivery.

10. A second blank form financial affidavit was provided to Goldberg.

11. Goldberg stated during the hearing that his medical condition was fine and that he was under observation.

12. Goldberg originally completed the financial affidavit indicating that he had no assets; however, after further consideration, Goldberg amended the affidavit to indicate that he had approximately $1,000.00 in his prison commissary account.

13. The court indicated that it would direct that $500.00 be removed from the account to make partial payment for the cost of legal representation provided to Goldberg at government expense.

14. Upon further consideration, however, the court determined that any amount in Goldberg's account in excess of $200.00 would be paid to defray the cost of Goldberg's representation.

15. The court appointed the Federal Public Defender to represent Goldberg; specifically, Goldberg was represented by Assistant Federal Public Defender Thomas Thornton, Esquire.

16. On January 16, 1996, Goldberg moved to proceed *pro se* and to waive counsel. However, he claimed that he was doing so because the Public Defender's Office had a conflict of interest and because he could not afford to be represented.

17. On January 19, 1996, the court held a hearing with respect to Goldberg's request to proceed *pro se.*

18. At the hearing, Goldberg again claimed that the Federal Public Defender had a conflict of interest and sought substitute counsel.

19. The basis for the claimed conflict of interest was that the Federal Public Defender had referred the case to Lunsford as part of its usual practice of referring cases to members of the Criminal Justice Act panel when the Federal Public Defender is unable to handle a case due to workload or conflicts.

20. The court held that there was no conflict of interest and refused to substitute counsel.

21. Goldberg elected to proceed *pro se.*

22. Goldberg then began to file a series of motions having little or no merit, including:

(a) a motion for the return of the funds taken from his prison account or, in the alternative, to dismiss for double jeopardy and collateral estoppel;

(b) a motion for a change of venue and for a hearing based on pre-trial publicity, and included in support thereof a newspaper article all of four sentences long which simply recited the charges against Goldberg;

(c) a motion for disclosure of grand jury matters;

(d) a motion for leave to take an interlocutory appeal from the denial of substi-

tute counsel, which Goldberg claimed was a final decision;

(d) a motion for unrestricted access to telephones and "other legal resources";

(e) a notice of appeal of the denial of substitute counsel (without leave of court);

(f) a notice of intent to present expert testimony regarding Goldberg's mental condition; and

(g) a "renewed or supplemental" motion for access to telephone and other resources.

23. After Goldberg informed the court and counsel that he intended to change his plea to guilty, a hearing was convened on February 1, 1996, for the purpose of entering the plea.

24. For purposes of the hearing, Goldberg was required to be transported approximately 25 miles from USP–Lewisburg, a high security facility, to the courthouse in Williamsport by the U.S. Marshals Service.

25. Also in attendance were counsel for the government, the case agent, defense counsel, the undersigned judge, and courtroom personnel.

26. When Goldberg arrived at the courthouse, he did not intend to enter a guilty plea.

27. Goldberg requested and was given permission to contact his former appellate counsel in Philadelphia ostensibly to discuss the entry of a guilty plea.

28. Goldberg never entered the guilty plea.

29. Goldberg attempted to revisit the issue of the Federal Public Defender's purported conflict of interest, but the court declined to do so.

30. Goldberg continued to pour motions into the court, including:

(a) an *ex parte* motion for the substitution of stand-by counsel (Thornton) based on the same purported conflict of interest which the court had rejected previously;

(b) another *ex parte* supplemental motion in support of access to telephone and other resources;

(c) a motion for a stay in this court pending Goldberg's interlocutory appeal of the denial of his motion for substitute counsel;

(d) a motion "for production of law enforcement interview reports or notes with individuals who will not be witnesses at trial";

(e) a motion to interview witnesses under the government's custody or control no later than ten days before trial;

(f) a motion for the production of personnel files of BOP personnel who would testify at trial; and

(g) a motion for a continuance so that Goldberg could pursue his interlocutory appeal and because Goldberg's eye problem was giving him migraine headaches.

31. On February 13, 1996, Goldberg filed, through stand-by counsel, a "Notification of Exercise of Sixth Amendment Right to Counsel," claiming that he had been incompetent at the time that he waived his right to counsel due to various prescription medications he was taking.

32. Goldberg next attempted to enter a plea of nolo contendere based on a purported agreement with the government.

33. In fact, the purported agreement was a copy of a plea offer tendered by the government which Goldberg amended to suit himself and submitted to the court.

34. The court rejected the purported agreement, refused to accept a plea under conditions unilaterally imposed by Goldberg, and forwarded the purported plea agreement to counsel for the government without entering the document on the record. Order # 1 dated February 13, 1996.

35. Goldberg also attempted (but failed) to have produced, at government expense and without leave of court, transcripts of proceedings in this court for the purpose of pursuing his interlocutory appeal, despite our prior order that no action would be taken with respect to the appeal absent an order from the Third Circuit. Order # 2 dated February 13, 1996.

36. At a hearing on February 14, 1996, the court appointed the Federal Public De-

fender to represent Goldberg, over his objection that there was a conflict of interest, despite the court's earlier ruling.

37. Based on the hearing of February 14, 1996, jury selection remained as then scheduled but the start of trial was delayed to allow counsel to prepare.

38. Counsel also was granted an extension of time to file any remaining pre-trial motions, and Goldberg was told that all motions were to be filed by counsel and no further *pro se* motions were to be filed.

39. All outstanding *pro se* motions were denied, with leave to re-file the motions through counsel.

40. A jury was selected on February 14, 1996.

41. A number of pre-trial motions then were filed through defense counsel, including:

(a) a notice of intent to introduce psychiatric or psychological expert testimony bearing on the issue of intent;

(b) a motion for a bill of particulars;

(c) a motion to dismiss under the Double Jeopardy Clause;

(d) a motion for reconsideration of our order denying review of the personnel files of BOP employees;

(e) an *ex parte* motion to compel handwriting exemplars;

(f) an *ex parte* motion for service of subpoenas and subpoenas duces tecum;

(g) an *ex parte* motion for writs of habeas corpus ad testificandum; and

(h) an omnibus motion to adopt all of Goldberg's previous *pro se* filings.

42. In a memorandum dated February 29, 1996, we denied in part Goldberg's motions for subpoenas and writs of habeas corpus ad testificandum, reasoning that Goldberg did not have a "right" to be in the law library, that any such "right" if it did exist could not be exercised by creating a fake order of court, and that Goldberg's intent was to circumvent the directives of prison authorities (as opposed to his motive of daily access to the law library).

43. The court also rejected as completely lacking merit Goldberg's contention that the signature of Magistrate Judge Sorrentino was not put on the order to "authenticate" the order but to "complete" the order.

44. In a memorandum issued on June 21, 1994, we noted that a proffered motion by Goldberg to dismiss the indictment because he had been punished administratively, so that the instant prosecution would be double jeopardy, was without merit. 855 F.Supp. at 731.

45. Despite that prior ruling, our denial of such a motion, and our denial of leave to appeal, Goldberg moved for leave to issue a subpoena for a witness whose proffered testimony related to the internal disciplinary proceedings.

46. Leave to issue the subpoena was denied. Memorandum of February 29, 1996, at 17 ¶ 10.

47. Goldberg moved for reconsideration of our memorandum and order denying in part his motion for subpoenas and subpoenas duces tecum.

48. On March 7, 1996, Goldberg filed a motion to dismiss based on Department of Justice misconduct.

49. The purported misconduct on the part of the DOJ consisted of the opening of what Goldberg deemed to be properly marked legal mail addressed to him at USP–Lewisburg.

50. In responding to a motion in limine by the government, Goldberg again argued that evidence of internal prison disciplinary proceedings were relevant and admissible at trial. Defendant's Responsive Brief to the Government's Motion in Limine (record document no. 176) at 2.

51. In motions in limine filed March 7, 1996, Goldberg again moved to suppress the statements made to Attorney Tafelski.

52. On March 7, 1996, Goldberg, acting *pro se*, filed a notice of interlocutory appeal based on the issue of double jeopardy.

53. On March 11, 1996, Goldberg, acting *pro se*, filed an *ex parte* "Supplement to Unopened Motion to Substitute Counsel."

54. In the latter motion, Goldberg "renewed" his claim of a conflict of interest on the part of the Federal Public Defender and submitted Clifford A. Rieders, Esquire, as substitute counsel.

55. Despite our prior ruling that Goldberg's claim that Magistrate Judge Sorrentino's signature was placed on the fake order to "complete" it rather than to "authenticate" it was absolutely devoid of merit, Memorandum of February 29, 1996, at 12 ("Merely restating this silly argument demonstrates its lack of merit, . . ."), Goldberg sought to have the jury instructed with respect to the same "defense." Goldberg's Requested Instruction No. 16 (record document no. 90) at 1.

56. The second trial of this matter began on March 11, 1996.

57. On March 13, 1996, out of the presence of the jury, counsel for the government represented to the court that he had not spoken to anyone from the BOP about information contained in the legal mail which Goldberg claimed had been unlawfully opened.

58. On Thursday, March 14, 1996, the jury returned a verdict of guilty as to both counts of the indictment.

### C. Post–Trial Proceedings

1. In a Memorandum and Order of Court dated March 20, 1996, upon reconsideration, we denied Goldberg's motion to dismiss based on DOJ misconduct, finding that (1) so long as the opening of mail is consistent with DOJ/BOP regulations, there is no impropriety on the part of BOP employees, and (2) Goldberg failed to demonstrate that any purported impropriety impacted these proceedings.

2. On March 21, 1996, Goldberg, again acting *pro se,* filed an *ex parte* "Renewed Motion for Substitution of Counsel or to Proceed *In Propria Persona.*"

3. In the latter motion, Goldberg cited a number of alleged deficiencies in Attorney Thornton's performance which Goldberg claimed showed that the purported conflict of interest had an adverse effect on the representation.

4. Once again, the court convened a hearing to determine whether Goldberg was making a knowing and voluntary waiver of his right to counsel.

5. Once again, Goldberg indicated that he did not want to proceed *pro se* but to substitute counsel.

6. The hearing, held on April 1, 1996, was yet another complete waste of time and resources on the part of the court, defense counsel, counsel for the government, the case agent, the U.S. Marshals Service, and presumably the BOP (which would have to coordinate Goldberg's transportation to court with the Marshals Service).

7. The court denied the motion to proceed *pro se* (or *in propria persona,* as used by Goldberg).

8. In a ruling issued March 22, 1996, and received by this court on April 8, 1996, the Court of Appeals for the Third Circuit dismissed Goldberg's appeal for lack of jurisdiction.

9. On April 17, 1996, Goldberg, proceeding *pro se,* filed an *ex parte* "Renewed Motion to Remove Current Defense Counsel or in Alternative Motion for New Trial." Record Document No. 212.

10. In this motion, Goldberg again claimed that there was a conflict of interest on the part of the Federal Public Defender, and again claimed that the conflict had led to a deficient performance on the part of counsel.

11. Goldberg also claimed that Thornton along with the court and counsel for the government somehow had denied Goldberg his right to testify in his own behalf.

12. On April 26, 1996, Goldberg filed a motion to reconsider our ruling with respect to the opening of legal mail at the penitentiary.

13. On April 30, 1996, Goldberg filed a supplement to the motion concerning legal mail.

14. On May 16, 1996, Goldberg, proceeding *pro se,* filed an "Emergency *Ex Parte* Letter Motion" claiming that he was the subject of an investigation by the FBI, and

that a client of Thornton was providing assistance to the government in the investigation.

15. The court directed a response from counsel, and Thornton indicated that he had no inkling of the basis for Goldberg's motion.

16. The court then directed Goldberg to provide the name of the cooperating witness and the source of his information.

17. Instead, Goldberg filed another *"Ex Parte* Letter Motion" stating only that the cooperating witness was not an inmate and that he wished to speak to an attorney so that he did not "violate any of my rights; including and not limited to my 5th Amendment rights ..." Record Document No. 225.

18. Since the court could not discern any basis for Goldberg's request, we again directed Goldberg to provide the name of the supposed cooperating witness.

19. Instead, on May 31, 1996, Goldberg filed another motion claiming that the Federal Public Defender had a conflict of interest and documents purportedly supporting the claim.

20. Also on May 31, 1996, Goldberg filed a document regarding the fact that the clerk of court had failed to mark an order sent to Goldberg as legal mail.

21. On June 3, 1996, Goldberg filed a document stating that he could not name the purported informant represented by Thornton because he needed a five day extension from the date that all "law work" was returned to him.

22. Because Goldberg twice had failed to respond properly, the court deemed the motion related to the "mystery mole" to be withdrawn.

23. On June 14, 1996, Goldberg filed a second supplement to his motion to reconsider our ruling with respect to legal mail.

24. On June 26, 1996, Goldberg filed a third supplement to his motion to reconsider our ruling with respect to legal mail.

25. On July 30, 1996, Goldberg filed a fourth supplement to his motion to reconsider our ruling with respect to legal mail.

26. On August 2, 1996, the date of sentencing, Goldberg filed yet another *pro se*

motion to remove the Federal Public Defender. (This motion is discussed at length in Part VI(D) of this memorandum, and so is not described further for present purposes.)

27. Goldberg was sentenced to two concurrent terms of incarceration of 30 months, to run consecutive to any term of incarceration previously imposed. *See* U.S.S.G. § 5G1.3(a).

28. On August 8, 1996, Goldberg filed yet another *pro se* motion for reconsideration of our order concerning reimbursement of the cost of representation.

### III. STANDARD OF REVIEW

The applicable provision of the United States Sentencing Guidelines (U.S.S.G.) provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

An adjustment under this section is not appropriate as punishment for the exercise of a constitutional right, as by going to trial rather than entering into a plea agreement. U.S.S.G. § 3C1.1, Application Note 1.

A non-exhaustive list of examples of conduct to which the enhancement is intended to apply, provided by the Sentencing Commission, includes "threatening, intimidating or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1, Application Note 3(a). The enhancement has been applied to situations in which the victim is defense counsel. *United States v. Ramey,* 24 F.3d 602, 609 (4th Cir.1994) (threats to court and defense counsel which led to recusal of judge and replacement of counsel), *cert. denied,* —— U.S. ——, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995); *United States v. Jennings,* 855 F.Supp. 1427, 1448 and n. 22 (M.D.Pa.1994) (assault on defense counsel), *aff'd,* 61 F.3d 897 (3d Cir.1995) (table).

■ In instances in which the allegedly obstructive conduct is a threat, the effect on

the person threatened, not whether the defendant intended the threat to be taken seriously, determines whether the threat constitutes obstruction under § 3C1.1. *Ramey* at 609.

■ The government bears the burden of demonstrating by a preponderance of the evidence that the defendant knowingly obstructed justice. *United States v. Kim,* 27 F.3d 947, 960–961 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); *United States v. Belletiere,* 971 F.2d 961, 965 (3d Cir.1992). When the obstruction consists of providing false information, the information must be materially false. U.S.S.G. § 3C1.1, Application Note 3(f), (g), (h). The manipulation of court proceedings and filings may be the basis for an enhancement under U.S.S.G. § 3C1.1. *See Belletiere* (because defendant's expressed desire to resolve marital problem was reasonable explanation, government did not produce sufficient evidence to show that defendant quit-claimed his interest in residence in willful attempt to obstruct justice); *United States v. Stein,* 37 F.3d 1407 (9th Cir.1994) (knowing submission of forged document to impeach witness supported enhancement), *cert. denied,* —— U.S. ——, 115 S.Ct. 1170, 130 L.Ed.2d 1124 (1995).

### IV. ENHANCEMENT UNDER U.S.S.G. § 3C1.1

■ At the time Goldberg was sentenced after the first trial, we found that a two-point enhancement to the Base Offense Level was warranted under U.S.S.G. § 3C1.1. The enhancement was based on the threat to the life of defense counsel. We see no reason to reach a different conclusion, and we so find again.

### V. UPWARD DEPARTURE

■ Under 18 U.S.C. § 3553(b) and U.S.S.G. § 5K2.0, the court may impose a sentence outside of the range established under the Sentencing Guidelines if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in

a sentence different from that described." U.S.S.G. § 5K2.0 (quoting § 3553(b)). The aggravating or mitigating circumstance must be "present to an unusual degree and distinguish[ ] the case from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing." Sec. 5K2.0.

In this case, there are circumstances present which distinguish the case from the heartland cases. First, the threat on the life of counsel is an extreme circumstance easily warranting the two-point enhancement, and any further obstructive conduct would warrant more than two points. Stated without technical language, Goldberg used up his two points when he threatened the life of his court-appointed counsel.

In addition, Goldberg noted to Tafelski that his manner of acting out was through paper, as opposed to the violent acts of many other penitentiary inmates. Goldberg has demonstrated his willingness to use "paper" throughout these proceedings. In doing so, he has attempted to delay and disrupt these proceedings in almost every way imaginable. Succinctly stated, these have included:

(a) filing notices of intent to introduce psychiatric evidence, despite never having filed a timely notice of an insanity defense or having such evidence (in competent form) available, as well as other motions, etc., relating to an insanity defense (Notice of Insanity Defense, record document no. 16; Order of Court dated May 27, 1994, record document no. 17; 855 F.Supp. at 729–730; "*Exparte* [sic] Motion for Presentence Psychiatric Evaluation and for Other Relief," record document no. 47 (filed August 17, 1994, and refiled August 19, 1994); Order of Court dated September 6, 1994, record document no. 55; Defendant's Exhibits in Support of Motion for Downward Departure and Objections to P.S.I., record document no. 65, objections to ¶ 38 and part "E"; Findings of Fact, Part B, Nos. 22(f), 31, 41(a); Motion for Service of Subpoenas and Subpoenas and Subpoenas Duces Tecum, record document no. 158; Memorandum of February 29, 1996, at 15–16; Finding of Fact, Part B, No. 47);

(b) repeatedly filing pre-trial motions, despite having been informed either by counsel

or by the court that the motions were without merit (*See, e.g.,* 855 F.Supp. at 731 (internal prison disciplinary proceedings did not constitute jeopardy for purposes of a double jeopardy challenge); Findings of Fact, Part B, Nos. 22(a), 41(c), 44, 45, 46, 50, 52, Part C, No. 8);

(c) repeatedly filing motions *pro se*, despite having been directed to file motions through counsel (Findings of Fact, Part B, No. 38);

(d) seeking subpoenas, subpoenas duces tecum, and writs of habeas corpus ad testificandum for witnesses and evidence to support defenses which were without merit, despite having been informed of the lack of merit (*compare, e.g.,* Findings of Fact, Part B, No. 43, *with* Findings of Fact, Part B, No. 55);

(e) pursuing two separate, concurrent, and frivolous appeals, again acting *pro se;*

(f) making misrepresentations to the court concerning such matters as access to the law library, the effect of medications on competency, and the effect of an eye injury [2];

(g) making misrepresentations to the court and counsel as to the desire to enter a plea of guilty or nolo contendere, and thereby causing a major waste of time and resources with no justification whatsoever;

(h) making misrepresentations concerning the performance of counsel, particularly with respect to purported violations of counsel's duties of loyalty and diligence, in pursuit of an issue (substitution of counsel) which previously had been ruled upon by the court and which lacked (and continues to lack) merit [3];

(i) repeatedly causing the court to convene hearings with no substantial justification, causing a major waste of time and resources.

In addition to all of the foregoing, we note that the record in this case is now approaching three hundred documents, a number which, following appeal (Goldberg filed his notice of appeal immediately after sentence was imposed), surely will be surpassed. Of those documents, the vast majority relate to frivolous motions or other documents filed by Goldberg, consisting of the motions themselves or briefs, exhibits, or memoranda and orders of the court related to the issues raised by Goldberg. While it is true that the exercise of constitutional rights may not constitute obstruction of justice, there is no right to file frivolous motions, notices, and other documents, particularly when the intent of doing so is solely to delay and disrupt judicial proceedings.

We conclude that Goldberg has obstructed justice through the repeated filing of frivolous motions, often filed *pro se* without leave of court, through misrepresentations to the court, and through causing the court to convene hearings with no substantial basis, all of which conduct was intended to and did have the effect of delaying and disrupting these proceedings, or was an attempt to do so in any instance in which no actual obstruction occurred. In combination with Goldberg's threat on the life of his court-appointed counsel, the kind and degree of Goldberg's obstructive conduct is outside of the heartland of cases, and an upward departure of two levels under U.S.S.G. § 5K2.0 is warranted.

Since the threat on the life of counsel alone warrants a two-point enhancement, and the remaining obstructive conduct would warrant an independent two-point enhancement, the court departed upward by two levels, so that the Total Offense Level is 10, computed as follows:

| | |
|---|---|
| Base Offense Level | 6 |
| Adjustment for Obstruction of Justice | 2 |
| Departure for Obstruction of Justice | 2 |
| TOTAL OFFENSE LEVEL | 10 |

---

**2.** We do not doubt the existence of Goldberg's eye injury. The questionable aspect of the injury, and the representation we discredit, is its purported effect on these proceedings.

**3.** The prime example of the lack of merit in this claim is Goldberg's representation to the court that a conflict of interest exists on the part of the Public Defender and that the conflict has had an adverse effect on the performance of counsel. In the telephone conversation between Goldberg and his mother, a copy of which was submitted by the government and a transcript by the defense, Goldberg states directly that counsel has "done everything I've told him to do. ... which is perfect." Transcript at 3. Goldberg's own statement reveals that his repeated complaints about the performance of counsel simply are untrue.

With Goldberg's Criminal History Category of VI, the sentencing range is 24–30 months; a sentence at the upper end of this range is appropriate. Goldberg was sentenced to two concurrent terms of incarceration of 30 months, to be served consecutive to any prior term of imprisonment. *See* U.S.S.G. § 5G1.3(a).

## VI. REMAINING MOTIONS

### A. Motion to Reconsider Order Requiring Goldberg to Pay Attorney's Fees

As recited above, the court ordered that any amount in Goldberg's commissary account would be used to defray the cost of his representation by the Federal Public Defender's Office. To that end, the court directed the Bureau of Prisons to retain any such amount pending further order of court. It now appears that the amount "frozen" by the BOP is $582.23. Goldberg now contends that requiring him to pay this amount would work a severe financial hardship.

As was pointed out in our prior order, we see no reason that an inmate, whose basic needs are provided by the BOP, needs a significant amount of money in a commissary account. Goldberg has managed since January to get by without that money, and has excess funds in the account.

Also, counsel for Goldberg pointed out at the time of sentencing that the amount expended by the Federal Public Defender at the time of our order is exceeded by the amount held by the BOP. The Federal Public Defender has expended many more hours since the order was issued. We also note that Goldberg received representation from Attorney Lunsford and appellate counsel. The cost of transcripts for the appeal alone greatly exceeds the amount held by the BOP. *See* Record Document No. 90 (voucher for payment of transcript in the amount of $2,931.00).

The motion for reconsideration, denied orally at the time of sentencing, will be reaffirmed, and the money deposited with the clerk to defray the expense of representation.

### B. Motion to Reconsider Order Regarding Mail at USP–Lewisburg

Goldberg filed a motion to reconsider our Order of July 8, 1996, regarding the alleged opening of legal mail at USP–Lewisburg. The motion is based on "after-discovered evidence." The envelopes appended to the motion do not suffice as evidence since neither appears to have the proper marking for legal mail in federal prisons, i.e. the "Special mail" marking required by BOP regulations. *See* 28 C.F.R. § 540.18(b).

Regardless, Goldberg fails to show that the alleged opening of the mail has affected these proceedings save a general statement that his "ability to fully communicate with the court and counsel" has been limited. Goldberg has demonstrated ample ability to communicate with the court, appointed counsel, and other attorneys, as he sees fit.

Based on the foregoing, we continue to see no justification for injunctive relief in the context of a criminal matter, and the motion for reconsideration was denied.

### C. Psychiatric Examination

Goldberg next filed a "Petition for Sua Sponte Motion by the Court for Psychiatric Examination to Determine the Present Mental Condition of the Defendant." While a petition for a sua sponte motion by the court is certainly a novel concept, given its oxymoronic nature, we nevertheless considered the merits of the petition, and found it lacking.

In support of his motion, Goldberg indicates that he is taking psychotropic medications which, according to the Physicians Desk Reference, are prescribed for major depressive episodes which interfere with daily functioning. Goldberg provides no statement, as in a record of examination, by a psychologist or psychiatrist that his mental functioning is impaired to the extent that he may be incompetent. Medication for depression is consistent with Goldberg's prior history, and we do not see the medication as "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally

incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).

The petition therefore was denied.

### D. Motion for Substitute Counsel

On the morning of sentencing, Goldberg filed yet another motion for the removal of his appointed counsel because of a purported conflict of interest. Unlike many of the past motions, this motion attempted to set forth a factual basis for an actual conflict of interest, as opposed to some theoretical interest on the part of the Federal Public Defender's Office in protecting its relationship with Attorney Lunsford.

■ Goldberg first argues that the Federal Public Defender has a conflict of interest arising from his case in Florida, for which Goldberg was awaiting re-sentencing during the re-trial and sentencing in this court. *See generally United States v. Goldberg*, 60 F.3d 1536 (11th Cir.1995) (affirming convictions but vacating sentence and remanding for re-sentencing). In Florida, Goldberg at one time was represented by the Federal Public Defender for the Southern District of Florida, which also represented a defendant named Eulalio Lopez. Following indictment for attempted escape, Goldberg executed an affidavit inculpating Lopez. Lopez then moved for new counsel based on the conflict of interest, and the motion was granted. Motion to Remove Federal Public Defender, Exhibits A, B.

The most obvious problem with this claim of a conflict of interest, of course, is that the Federal Public Defender in Florida was removed from representing Lopez, not Goldberg. There would be no conflict under these circumstances in continuing to represent Goldberg.

More importantly, each Federal Public Defender's Office is a separate office, *see generally* 18 U.S.C. 3006A(g), and a conflict of

interest on the part of one would not disqualify other Federal Public Defenders.

Goldberg's second claimed conflict of interest is that his mother, Estelle Snitzer, contacted Attorney Thornton after being contacted by the FBI with respect to an investigation of Goldberg for wire fraud committed while at USP–Lewisburg.[4] According to Attorney Thornton, the contact consisted of a telephone call from Ms. Snitzer after she was contacted by the FBI and an interview requested. Attorney Thornton told her that the Federal Public Defender could not represent her, that she might wish to contact another attorney or assert the Fifth Amendment if appropriate, but that they would provide her with what help they could, such as with a place to wait or take breaks from the interview. We see no conflict of interest in this contact, particularly since Attorney Thornton specifically informed Ms. Snitzer that his office did not and could not represent her.

■ Finally, Goldberg claims that a conflict of interest exists because the Federal Public Defender, James V. Wade, Esquire, represents another inmate named Anthony Mangano. Mangano was a cell-mate of Goldberg for a short period at USP–Lewisburg. When he was transferred, Mangano left behind some materials which included a plea agreement proffered by the U.S. Attorney. The proffered plea agreement included a provision that Mangano would provide assistance to the government in other investigations. When Goldberg turned the document over to Attorney Thornton, he indicated some concern that Mangano was cooperating against him. Attorney Wade expressed as much to Mangano, to which Mangano replied to the effect that he would not cooperate against anyone but Goldberg. Goldberg claims that Mangano has information concerning the case in Florida and could do so.

According to Attorney Thornton, neither he nor Attorney Wade took the comment seriously, considering it a product of the rather morbid sense of humor common

---

**4.** No further explanation of the circumstances of the charge are available, the government being unwilling to divulge information about an ongoing investigation, and Goldberg having asserted his privilege under the Fifth Amendment rather than explain the circumstances.

among inmates. Neither is aware of any cooperation or intended cooperation by Mangano. The plea agreement to which Mangano actually agreed did not have the provision requiring cooperation.[5] The case agent for this case then testified that he is unaware of any cooperation from Mangano, and in fact has no idea who Mangano is. The Assistant U.S. Attorney also represented that he was unfamiliar with Mangano, and that his office was unaware of any cooperation from Mangano.

In essence, then, Goldberg's proffer is that another inmate made an off-hand remark that he would cooperate against Goldberg. There is a possibility that Mangano could provide information, but no evidence that he has done so. As officers of the court, the attorneys involved have an affirmative duty to come forward when there is a substantial possibility of a conflict of interest. They have made affirmative representations to the contrary. We believe that these representations are entitled to a presumption of truth until there is some substantive evidence to the contrary. Mangano's remark is insufficient, particularly when it is his own attorney (the person who would be responsible for pursuing a reduced sentence) that is unfamiliar with any form of cooperation, and when Mangano specifically rejected an offer which included cooperation.

We found neither a conflict of interest nor a substantial basis for believing that a conflict of interest may exist so as to warrant an evidentiary hearing and delay of sentencing. Goldberg's latest eleventh-hour attempt to use the right to counsel as a means to delay and disrupt these proceedings was denied.

In this context, we note that Goldberg's manner of pursuing the claimed conflict of interest is similar to the method outlined for him by his former appellate counsel.[6] Appended as Exhibit 8 to Goldberg's sentencing memorandum is a document which we can only term rather remarkable. While represented by court-appointed counsel,[7] Goldberg apparently has been able to receive the advice of other attorneys. One of these is the attorney who acted as Goldberg's court-appointed appellate counsel while the instant case was before the Third Circuit. In a letter dated April 4, 1996, this attorney advised Goldberg how to go about establishing a claim of a conflict of interest on the part of the Federal Public Defender.[8]

The letter is remarkable in several respects. First, it is yet another example of Goldberg's ability to obtain the advice of various attorneys while maintaining that he is unable to obtain the services of counsel.

More importantly, the letter is somewhat unsettling. This court appointed the Federal Public Defender to represent Goldberg following the Third Circuit's reversal of the earlier verdict. We are aware of no entry of appearance by any other attorney in this matter, and we see no reason that the government should bear the cost of representation when an attorney or attorneys are providing free advice to Goldberg.

Moreover, the advice being provided relates to and disrupts the relationship between Goldberg and his appointed counsel. We find it extremely disturbing that an attorney would advise a criminal defendant on how to build a case that his attorney has a conflict of interest when (1) the court already has ruled that no such conflict exists and (2) the proceedings to which the representation pertains are ongoing. It also is improper in the extreme for counsel to build a case for

---

5. The court accepted the representation of Attorney Thornton in this respect. A copy of the plea agreement submitted by the government shortly thereafter confirmed the representation.

6. The attorney's name is not set forth herein because of the court's intention to publish this opinion.

7. And while claiming that the opening of legal mail was chilling his ability to communicate with the court and counsel.

8. This is not the first time that this letter has reared its ugly head. In his *"Exparte [sic] Renewed Motion to Remove Current Defense Counsel or in Alternative Motion for New Trial"* (record document no. 212, filed April 17, 1996), Goldberg incorporates much of the text of the letter into the body of his motion. Of course, those parts of the letter referring to the lack of a factual basis for the motion, or otherwise pointing out the lack of merit in the motion, are excised. Also excised is the identity of the drafter of the text.

appeal in this manner, even at the client's suggestion.

We recognize that many clients wisely seek a second opinion in legal matters. This practice, however, does not extend to advice provided *gratis* which affects such a sensitive area. A criminal defense attorney needs his client's full cooperation and assistance when the adversaries are able and enthusiastic prosecutors with considerable resources and competent investigators to support them. We also recognize that Goldberg is an intelligent, manipulative defendant who has chosen the purported conflict of interest as an issue on which to concentrate his efforts to delay and disrupt these proceedings.

Having recognized as much, there remains the concern over the potential for interference in the attorney-client relationship that the letter represents. The spectacle of one attorney advising a defendant as to how to undermine his relationship with a second attorney during the course of criminal proceedings against the client is unseemly in the extreme, and poses considerable risk to the client.

In addition to all of this, there are a number of statements in the letter which are questionable, to say the least. In several places, the letter refers to Goldberg's position that Attorney Lunsford lied about the threat by Goldberg. Exhibit 8 at 1 ¶ 1; at 3 ¶ 4c; at 4 ¶ 4e. At no point in these proceedings, whether at the time the court permitted Attorney Lunsford to withdraw, at the time Attorney Lunsford testified with respect to the incident, or at either sentencing proceeding, did Goldberg deny that he made the statements. In fact, his representations have been that he was justified in acting as he did because of Attorney Lunsford's lack of enthusiasm and competence, and that Attorney Lunsford took the threat more seriously than was warranted. The merits of these contentions are discussed below. *See* Part VI(E), *infra.*

From the attorney's letter, it is not clear whether Goldberg represented to him that he was making the contention that Attorney Lunsford was a liar, or whether the attorney determined that such was the best way for Goldberg to approach the problem. It is clear, however, that the contention that Goldberg has presented a different factual scenario related to his conversation with Attorney Lunsford is wrong, and the arguments derived therefrom are without merit.

The letter cites *United States v. Moscony,* 927 F.2d 742, 749–750 (3d Cir.1991), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984, *reh'g denied,* 501 U.S. 1270, 112 S.Ct. 16, 115 L.Ed.2d 1100 (1991), for the proposition that this court is required to weigh certain factors in making a determination with respect to the substitution of counsel, and that we failed to do so. Exhibit 8 at 4. Actually, *Moscony* refers to the factors a district court must weigh in deciding whether to accept the waiver of a conflict of interest when the defendant wishes to continue with the same representation. In this case, we have determined that no conflict of interest exists, and Goldberg wishes to substitute counsel, not waive a conflict to keep the same counsel. *Moscony* is clearly inapposite.[9]

Moreover, the language of the letter is itself strongly suggestive of the lack of merit in the conflict of interest claim. The attorney points out that the claim "is very weak" and the position does not appear "viable." Exhibit 8 at 1. He adds that Goldberg needs to create a record, i.e. a factual basis, to support the claim. Exhibit 8 at 24.

Finally, we take umbrage with the statement that our refusal to substitute counsel without cause is "a hollow and petulant rationale ..." Exhibit 8 at 5. The Federal Public Defender's Office exists for the very purpose of representing indigent defendants. They are intimately familiar with criminal practice in this court and deal with the various offices (chambers, Clerk of Court, Probation & Parole, U.S. Attorney, etc.) on a regular basis.

---

9. The citation to *Moscony,* however, does give rise to one bit of irony. The opinion of the Third Circuit sets forth the following statement in addressing the factors to be considered by a district court before accepting the waiver of a conflict of interest: "Finally, the court has an independent interest in protecting a fairly-rendered verdict from trial tactics that may be designed to generate issues for appeal." 927 F.2d at 749.

Attorneys from the Federal Public Defender's Office routinely perform their duties in a capable manner; actually, more than capable. To allow any defendant, inmate or otherwise, to remove the Federal Public Defender without cause imposes on members of the Criminal Justice Act panel, who have private practices to maintain, and amounts to a statement that the Federal Public Defender's Office is not representing its clients to the fullest extent possible.

This court is unfamiliar with any court which allows defendants to choose their own counsel, then makes the government bear the cost. It is offensive for an attorney to state that the court is being "petulant" for requiring a criminal defendant to give a valid reason for the substitution of counsel.[10] Unlike the erroneous law for which *Moscony* was cited, the standard for the substitution of counsel is that the defendant must show good cause for the substitution.[11] The motion was denied because Goldberg never showed good cause for the substitution, not because of petulance on the part of the court.

In the same vein, the letter points out that the decision to deny substitute counsel "created the unseemly appearance that the court was punishing you for having the temerity to have the district court reversed on appeal; ..." Exhibit 8 at 5. Goldberg is not the first litigant to win a reversal of a judgment of this court, nor is it to be expected that he will be the last. No court likes to be reversed, for the simple, human reason that we do not like to be wrong. However, if this court commits error, it expects to be reversed;

that is how our system of justice works, and hopefully the end result is exactly that, justice. If it is a higher court which corrects our errors, at least the error is corrected. This court does not regard seeking and obtaining justice to be "temerity."

Even so, we would note that Goldberg also is not the first criminal defendant to seek the substitution of counsel in this court, and the same standard, good cause, has been applied in every such instance. *See, e.g., Jennings* at 1441–1443 (also citing *United States v. Moore*, No. 4:CR–92–0322 (M.D.Pa.); *United States v. Rollins*, No. 4:CR–94–0037 (M.D.Pa.)[12]). *See also United States v. Waye*, No. 1:CR–91–0200 (M.D.Pa. memorandum filed January 12, 1994) (non-inmate defendants). The reversal in Goldberg's case did *not* change the standard we applied for reviewing a motion to substitute counsel. A court is not being "petulant" or "punishing ... temerity" when it applies the law in a consistent manner.

In all likelihood, the attorney letter was not the impetus for any of Goldberg's many motions, and Goldberg's motions simply would have taken another form without the letter. This letter, however, never should have been written. At best, the letter should have ended after the third sentence of the third paragraph, when it is suggested that a motion to remove the Federal Public Defender was weak on the record established and would not be granted absent an expanded factual basis. It is one thing for a second attorney to evaluate a legal position; it is

---

**10.** In the letter from the attorney to Goldberg, no case from this or any other circuit is cited for the proposition that petulance is reversible error.

**11.** The opinions of the Third Circuit with respect to the substitution of appointed counsel generally have dealt with fact patterns which differ somewhat from the circumstances of this case, at least in the posture of the motion to remove the Federal Public Defender. The standard when discussed by the Third Circuit has been in the context of a motion made on the eve of trial, thereby necessitating a continuance for new counsel to become familiar with the case. *See Govt. of the Virgin Islands v. James*, 934 F.2d 468 (3d Cir.1991); *McMahon v. Fulcomer*, 821 F.2d 934 (3d Cir.1987); *United States v. Welty*, 674 F.2d 185 (3d Cir.1982). Other courts of appeals, however, have applied the "good cause" stan-

dard even when the motion will not delay trial; the timeliness of the motion simply becomes one of the factors considered by the trial court, thereby lessening the showing the defendant must make as to other factors, such as the conflict between the defendant and counsel. *United States v. Mullen*, 32 F.3d 891, 895 (4th Cir.1994); *United States v. Iles*, 906 F.2d 1122, 1130–1131 (6th Cir.1990) (collecting cases). In this instance, since the claim of a conflict of interest fails, there is *no* cause for the substitution, even weighing the timeliness factor in Goldberg's favor.

**12.** Although Rollins' motion for substitution of counsel was denied, a later motion to withdraw was granted when an actual basis for withdrawal was presented. *Jennings* at 1443 n. 11.

quite another thing for the attorney to begin advising another attorney's client as to litigation tactics, particularly when those tactics involve efforts to establish an adversarial position with counsel appointed to defend the client.

We note as well that the latest motion by Goldberg is consistent with the advice provided in the letter, although other bases than the purported conflict are raised.[13] Goldberg uses the imputed conflict theory with the Federal Public Defender's Office in Florida. Exhibit 8 at 3 ¶ 4d, 4–5 ¶ 4f. The rule that an attorney may not represent a person when the representation will be materially limited by responsibility to a third person is raised in the claims related to Snitzer and Mangano. Exhibit 8 at 3 ¶ 4c. And Goldberg demands a hearing and separate counsel for purposes of the alleged conflicts of interest. Exhibit 8 at 3 ¶ 4a. In short, while the letter may not have been the reason that Goldberg decided to file meritless motions, it certainly provided him with a procedure to follow.

Notwithstanding the letter, we find no factual basis for a conflict of interest on the part of the Federal Public Defender, either actual or latent. Nor is there a substantial reason to believe that such a conflict of interest exists which would require an evidentiary hearing or appointment of separate counsel; mere suspicion (even assuming it to be genuine) on Goldberg's part does not warrant such action by the court. Goldberg's latest motion to remove the Federal Public Defender therefore was denied, a holding to be reaffirmed in the accompanying order.

### E. Pre–Sentence Memorandum

In a memorandum of law submitted shortly before sentencing, Goldberg set forth a number of arguments related to issues which arose with respect to the pre-sentence report. We noted at the time of sentencing that there simply was not sufficient time to address all issues at that time, and that the issues would be addressed in this sentencing memorandum. To the extent an issue is not discussed herein, it may be presumed that the issue did not warrant further discussion.

We noted above that Goldberg has never denied the events retold by Attorney Lunsford concerning the threat by Goldberg. Instead, Goldberg contends that he was justified in threatening counsel because Goldberg deemed Lunsford to be incompetent and lacking zeal, Goldberg's Sentencing Memorandum at 2–3, and that Attorney Lunsford either took the threat too seriously, or only pretended to fear some action by Goldberg. *Id.* at 3.

As to the supposed lack of zeal and competence, we previously discredited this as a reason for substituting counsel, a point the Third Circuit affirmed. We again emphasize that a supposed lack of energy is not justification for a threat on the life of counsel.

As to the purported overreaction by Attorney Lunsford, any fair reading of the threat by Goldberg belies this contention:

A  Mr. Goldberg asked me to file documents indicating that I wished to withdraw from the case. In that document he asked me to put several things for the record, one, that I was unprepared for trial; two, that I was incompetent; and I can't recall what the third item was, but they were all along the same lines.

I indicated to Mr. Goldberg during the phone conversation that that would be improper, that you had rendered your final order on the case prior to jury selection, and that I would happily give the file to any attorney who would contact me once he retained that attorney, and only upon him retaining an attorney would I deliver the file to that particular attorney.

Mr. Goldberg became very angry at me and then threatened my life.

Q  Can you be more specific?

---

**13.**  Presumably, Goldberg was unable to assemble the record suggested by the attorney. As we have noted, the Federal Public Defender, when assigned a case, will pass the case on if the workload of the Office is too great, or if there is a conflict of interest. The panel attorney who represents the defendant then controls the case. Payment, of course, is from funds designated for Criminal Justice Act expenditures, not from the Federal Public Defender as suggested by Goldberg to the attorney. Exhibit 8 at 4. The Federal Public Defender, then, cannot be said to control panel attorneys' representation, and no imputed conflict of interest can be said to exist.

A. Sure. As I recall, and I drafted a memo right after the conversation, and this may not be completely correct, but the threat went along the lines that he asked me how would I like if he took the money that he was going to hire the new attorney with and have someone come and get me. And it caught me off guard. I questioned him what he meant by those statements, and he said you know damn well what I mean, you piece of shit, you don't know who you're dealing with, I'm going to have someone come and get you, and you're not going to go home; at which time I closed the conversation. I think I said thank you, Mr. Goldberg, and I hung up.

N.T. 6/13/94 at 132–133. Goldberg now argues that there are other reasonable interpretations of this language, such as reporting Attorney Lunsford to the Supreme Court of Pennsylvania or attempting to have him removed from the Criminal Justice Act panel of attorneys. Goldberg's Sentencing Memorandum at 3. In none of these instances is it necessary to pay someone to "get" Attorney Lunsford, nor would the result be that Attorney Lunsford would not "go home." Goldberg's argument is disingenuous, at best.[14]

Goldberg next argues that the opinion of the Third Circuit bars a conclusion that the threat constitutes obstruction of justice. *Id.* at 3–4. This argument is premised on a reading of the opinion to the effect that the Third Circuit found that the threat to counsel did not support a finding of obstruction of justice because the same conduct did not support a finding of forfeiture. Goldberg quotes the Third Circuit's statement that "[e]ven if we were to accept a forfeiture argument, which as we have noted requires extremely serious misconduct, the facts of this case would not support such a result." *Id.* at 4 (quoting 67 F.3d at 1102). Goldberg's argument requires a warped, erroneous reading of the Third Circuit's opinion.

In fact, in reaching the conclusion that the record did not support a forfeiture of the right to counsel, the Third Circuit specifically *excepted* consideration of the threat because this court had not held a hearing on the matter with Goldberg present before making a factual determination that the threat had occurred:

Essential to the government's forfeiture reasoning is Goldberg's conduct in threatening his attorney's life. Similarly, in examining the district court's published opinion, we note that at least six of the sixteen separate findings the district court made on the issue of "waiver" pertained to Goldberg's alleged threat on Lunsford's life. *Goldberg,* 855 F.Supp. at 732–33. We note, however, that the district court's factual findings concerning Goldberg's death threat were made at a hearing held one week *after* the June 6 telephone conference to which Goldberg was not a party.

We make no express finding as to the implications of this procedure on Goldberg's Fourteenth Amendment right to procedural due process. Nevertheless, we believe that on the facts of this case an *ex parte* hearing where the defendant's interests were not represented cannot be used to justify a *post hoc* forfeiture argument. In [*United States v.*] *McLeod,* [53 F.3d 322 (11th Cir.1995)], where the Court of Appeals for the Eleventh Circuit found that the defendant's abusive conduct forfeited his right to counsel, the district court had conducted a hearing at which McLeod was present and permitted to testify. *McLeod,* 53 F.3d at 325–326. Absent the alleged death threat, moreover, the record here contains insufficient additional evidence of "abusive conduct" from which to conclude as a matter of law that Goldberg forfeited his right to counsel.

67 F.3d at 1102 (emphasis in original).

The Third Circuit's reasoning is: (1) this court did not hold a hearing at which

---

**14.** Goldberg also seems to be contending that Lunsford did not really take the threat seriously, but used it to be relieved of difficult representation. No real evidence is offered to rebut Attorney Lunsford's testimony to the contrary. The circumstances suggest otherwise as well: A so-

phisticated inmate at a high-security, federal penitentiary threatens to have someone "get" the attorney, with whom the inmate clearly is displeased. That someone who is not completely familiar with the penitentiary would be intimidated by such a threat is absolutely reasonable.

Goldberg was present and represented before determining that the threat was made; (2) the threat therefore cannot be considered in determining whether Goldberg forfeited his right to counsel; (3) absent the threat, there was no factual support for a finding of forfeiture, because no other conduct was sufficiently egregious. It does not follow from this reasoning that the threat did not constitute sufficiently egregious conduct, because *the threat was not considered.*

Moreover, such a finding would not preclude a holding that Goldberg obstructed justice. Forfeiture of the right to counsel follows only a finding of "extremely dilatory conduct." 67 F.3d at 1101. This standard is much higher than necessary for an enhancement for obstruction of justice, which requires simply actual or attempted obstruction.

Goldberg next argues that there is no basis for an enhancement because the threat actually made it easier for the government to obtain a conviction once counsel was removed. This argument completely ignores the "attempt" language in the commentary following U.S.S.G. § 3C1.1, and otherwise merits no further discussion.

One of the more unique arguments raised by Goldberg is that the threat related only to the first trial, and that the first trial is not the instant offense. Actually, the instant offense is the creation of the false order and its presentation to BOP personnel. Both trials are part of the process of "the investigation, prosecution [and] sentencing of the instant offense." U.S.S.G. § 3C1.1.

For these reasons, we rejected the arguments raised by Goldberg in his sentencing memorandum.

## VII. CONCLUSION

Sentence having been imposed, and all remaining motions having been disposed-of, no issues remain for the court. An order of judgment and commitment consistent with this memorandum and our findings at the sentencing hearing of August 2, 1996, has been entered.

## ORDER

For the reasons stated in the accompanying sentencing memorandum, **IT IS ORDERED THAT:**

1. The court's holdings at the time of sentencing are reaffirmed, as follows:

(a) There is no basis for a downward departure from the Total Offense Level under the Sentencing Guidelines;

(b) The Criminal History does not overstate the seriousness of Goldberg's prior offenses;

(c) The threat to the life of court-appointed counsel warrants a 2–point enhancement to the Base Offense Level for obstruction of justice under U.S.S.G. § 3C1.1.

(d) Goldberg's many groundless motions and false representations to the court warrant 2 additional points in the Total Offense Level, so that an upward departure under U.S.S.G. § 5K2.0 is warranted;

(e) The evidence submitted by the government does not support a finding that Goldberg suborned perjury, and no points are added to the Base Offense Level for this purpose, either as an enhancement or as an upward departure;

(f) With a Total Offense Level of 10 and a Criminal History Category of VI, Goldberg's sentencing range is 24–30 months' incarceration;

(g) A sentence at the high end of the range, i.e. 30 months, is appropriate.

2. Goldberg's motion (record document no. 248) to reconsider our order requiring partial reimbursement of the cost of representation is denied.

3. The Bureau of Prisons is directed to pay the sum of $582.23 currently held in Goldberg's account to the Clerk of Court as a partial reimbursement of the cost of representation.

4. The clerk is directed to deposit the monies collected from Goldberg, through the Bureau of Prisons, into the fund used for purposes of the Criminal Justice Act.

5. Goldberg's motion (record document no. 249) to reconsider our order with respect

to the alleged opening of legal mail at USP–Lewisburg is denied.

6. Goldberg's petition (record document no. 250) for a *"sua sponte"* order by the court to order a psychiatric examination of Goldberg is denied.

7. Goldberg's motion (record document no. 253) for the removal of the Federal Public Defender is denied.

8. Goldberg's repeated motion (record document no. 255) for reconsideration of our order concerning the partial reimbursement of the cost of representation is denied.

9. Goldberg's repeated motion (record document no. 256) for reconsideration of our order concerning partial reimbursement of the cost of representation is denied.

10. The clerk is directed to unseal any remaining portion of the record which remains sealed.